**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**



FILED BY _____ D.C.

APR 09 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | | |
|---|---|---|
| **JOHN NUÑEZ** | : | **CIVIL ACTION** |
| | : | |
| *:Plaintiff,* | : | **CASE NO.**_____ |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| **AMERICAN AIRLINES INC.,** | : | |
| *Defendant.* | : | |
| | : | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF ARISING FROM RETALIATORY BAN, CREW MISCONDUCT, AND CONTINUING HARM AFTER FAA EXONERATION

By: /s/ John Nuñez
John Nuñez
Pro Se Plaintiff
14475 SW 23rd Street
Miami, FL 33175
Telephone: (786) 425-1966

Email: johnnunez@ymail.com

1

## TABLE OF CONTENTS

I. Jurisdiction and Venue ..............................................................................1

II. Parties ....................................................................................................2

III. Factual Background ............................................................................. 2

IV. Causes of Action .................................................................................. 5

    Count I – Breach of Contract .................................................. 5

    Count II – Intentional Infliction of Emotional Distress ........................ 6

    Count III – Defamation ....................................................... 7

    Count IV – Violation of 42 U.S.C. § 1981 ...................................... 8

    Count V – Negligent Misrepresentation and Failure to Train ................ 8

    Count VI – Injunctive Relief .................................................... 9

V. Legal Clarifications, Procedural History, and Anticipated Defenses ................ 9

VI. Damages – Economic, Emotional, Professional, and Reputational ................ 11

VII. Captain Jaffee's Absence, Kolb's Concealment, and Quiroz's Ignorance ........13

VIII. Defendant's Own Rules Undermine Their Defense .............................. 14

IX. The March 28 Letter and April 7 Denial – Ongoing Harm and Judicial Estoppel ..... 15

X. Conclusion: Dignity, Justice, and the Right to Be Treated Fairly ................ 16

XI. Exhibit List ......................................................................................18

XII. Table of Authorities ........................................................................ 19

## TABLE OF AUTHORITIES

### Cases

- *King v. American Airlines, Inc.*, 284 F.3d 352 (2d Cir. 2002) – Sections V, ¶¶51–52
- *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406 (6th Cir. 2017) – Section V, ¶52
- *Love v. Delta Air Lines*, 310 F.3d 1347 (11th Cir. 2002) – Section V, ¶53
- *Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002) – Section V, ¶54; Count II
- *New Hampshire v. Maine*, 532 U.S. 742 (2001) – Section V, ¶¶55–56A; Section X

### Statutes, Treaties & Rules

- Montreal Convention (Articles 1, 17, 29) – Section V, ¶¶51–52
- 42 U.S.C. § 1981 – Introduction; Count IV
- Federal Rule of Civil Procedure 12(b)(6) – Introduction; Section V
- Florida Common Law – Impact Rule Exception – Section V, ¶54; Count II

### Internal Company Documents Referenced

- AA Conditions of Carriage (2022 & 2024 versions) – Sections IV, V; Exhibit J
- AAdvantage® Terms and Conditions – Section IV; Count I; Exhibit I
- Email from AA (Sept. 3, 2024 – "Exhibit G") – Section V, ¶56A; Section X
- Letter from AA (Mar. 28, 2025 – "Exhibit H") – Section V, ¶56A; Section X
- FAA Initial Decision, Docket No. G13-23-021 – Sections III, V; Exhibit C

**NOW COMES** the Plaintiff, **JOHN NUÑEZ**, appearing pro se, and respectfully submits this Complaint for damages and injunctive relief against Defendant **American Airlines, Inc.**, and states as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1367 (supplemental jurisdiction), as this action arises under federal civil rights law and state law claims that are so related as to form part of the same case or controversy.

2. Venue is proper in this District under 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred in this judicial district and involve a defendant conducting substantial business in Florida.

3. The amount in controversy exceeds **$75,000**, exclusive of interest and costs, as Plaintiff seeks compensatory, punitive, and injunctive relief arising from ongoing reputational harm, breach of contract, defamation, and emotional distress.

## II. PARTIES

3. Plaintiff John Nuñez is a U.S. citizen residing in Miami, Florida, and was an AAdvantage® Platinum Pro status holder with American Airlines at all times relevant to this action.

4. Defendant American Airlines, Inc. is a Delaware corporation, headquartered in Fort Worth, Texas, with substantial operations in Florida, including at Miami International Airport.

4

### III. FACTUAL BACKGROUND

5. On June 3, 2022, Plaintiff boarded American Airlines Flight 1124 from Barranquilla

    Colombia (BAQ) to Miami, Florida (MIA). Despite holding AAdvantage® Platinum Pro

    status, Plaintiff was traveling as a D3 non-revenue pass traveler—a benefit extended to

    legacy family members of retired American Airlines employees.

6. After boarding, Plaintiff requested to use the forward lavatory in the business class cabin

    due to a medical need. The rear lavatory was occupied at the time. The purser, Rosa Celi,

    denied the request, stating initially that lavatory use was "restricted to the cabin class"

    and later that such use was "prohibited by federal law."

7. No such federal law exists. The denial was not based on policy or safety concerns but on

    a misstatement of law and improper judgment.

8. Subsequently, Flight Attendant Ana Maria Sanchez publicly disclosed Plaintiff's D3

    status in front of other passengers, denied beverage service, and claimed that Plaintiff

    was being "difficult" and "argumentative"—statements contradicted

    by onboard video and FAA investigation findings.

9. Flight Attendant **Maria Quiroz**, in her own words, referred to Plaintiff's status as

    "Gold," when in fact his designation was **Platinum Pro**—a materially higher tier under

    the AAdvantage® program. Quiroz was not citing the onboard manifest or display, but

    rather echoing a misunderstanding of Plaintiff's own mention of his status—treating

    "Platinum" like a vague reference to a mineral, not a loyalty tier. At no point did she

verify Plaintiff's actual elite status, which was plainly visible on the crew device as "Platinum Pro," alongside "ADM" and "D3" (**Exhibit N**). Her testimony revealed both unfamiliarity with American Airlines' tier structure and a casual indifference to its Implications. Meanwhile, Flight Attendant **Ana Maria Sanchez** told Plaintiff, "your status doesn't mean shit here," while referencing his seat in economy class. She further stated, "you're D3—you should know better," implying that Plaintiff's AAdvantage® status was irrelevant due to his non-revenue designation. This rhetoric made clear that status alone did not afford Plaintiff the treatment the AAdvantage® program publicly promises. Plaintiff was made to feel like a freeloader, not a valued elite member. This wasn't what the brochure described—it was a public degradation rooted in bias and internal hierarchy.

These false statements were relayed to Captain Jafee, who ultimately ordered Plaintiff's removal from the aircraft, despite never speaking to Plaintiff directly or corroborating crew accounts.

10. Plaintiff was escorted off the plane in front of passengers and staff, causing public embarrassment, emotional trauma, and reputational damage. The incident was recorded and widely shared on social media, amplifying the harm.

11. Following the incident, the Federal Aviation Administration (FAA) initiated an enforcement action against Plaintiff. After a full hearing, the Administrative Law Judge rejected the FAA's proposed fine, reduced the charge, and found key testimony by

Defendant's crew to be unreliable or uninformed.

12. On March 28, 2025, American Airlines issued a written statement reinstating Plaintiff's travel privileges and welcoming him back. Plaintiff relied on this letter and purchased a paid ticket (Flight AA2280, MIA to MCO) for April 7, 2025.

13. Plaintiff was denied boarding at the airport, despite holding a valid, confirmed, paid reservation. No explanation was provided, and Plaintiff was told the ban was "still in place." This directly contradicted American Airlines' March 28 reinstatement letter and demonstrates the ongoing nature of the harm.

## IV. CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

*Defendant sold Plaintiff a ticket, confirmed his seat, and issued a reinstatement letter—then denied him boarding. This is breach in its purest form.*

15. Plaintiff entered into a binding agreement with American Airlines upon purchasing a paid ticket for Flight AA2280 on April 7, 2025.

16. Defendant accepted payment, assigned a seat, and confirmed the itinerary without limitation or disclaimer.

17. Plaintiff relied in good faith on a **March 28, 2025 letter** from Defendant which closed with the line, *"We appreciate your AAdvantage® loyalty very much, Mr. Nunez, and look forward to welcoming you on board your next American Airlines flight."* Defendant made

no mention of any ongoing ban, restriction, or limitation to Plaintiff's account. No

disclaimers were provided. Plaintiff interpreted this as a clear reinstatement of travel

privileges—especially after months of correspondence and a successful outcome at the

FAA hearing. Yet, just ten days later, when Plaintiff attempted to fly on a fully paid,

confirmed reservation, he was denied boarding at the airport. The so-called "welcome

back" was a corporate soft-walk—a false signal sent to evade further scrutiny while

continuing the very retaliation Plaintiff had already endured.

18. On the day of travel, Defendant refused to honor the contract without justification, in

breach of the Conditions of Carriage and consumer contract principles.

19. As a result, Plaintiff suffered economic loss, reputational injury, and further emotional

distress.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Escalation of a bathroom request into public humiliation, false accusations, and removal from flight constitutes conduct that is outrageous, intentional, and injurious.*

20. Defendant's employees knowingly escalated a benign bathroom request into a public

spectacle, relying on false statements and subjective judgment.

21. Sanchez and Celi both made statements that misrepresented Plaintiff's conduct, status,

and rights.

22. Celi falsely invoked a non-existent federal law. Sanchez publicly shamed Plaintiff and

labeled him as a problem passenger. Quiroz misidentified his status. Jafee acted without

firsthand inquiry.

23. These acts, taken collectively, constitute outrageous conduct and were done with
knowledge of Plaintiff's status and history with the airline.

24. Plaintiff experienced public humiliation, personal shame, reputational harm, and has
since been diagnosed with PTSD resulting from this event.

## COUNT III – DEFAMATION

*False statements made in front of passengers and federal investigators about Plaintiff's*
*conduct, demeanor, and status were reckless and reputationally damaging.*

25. Defendant, through its agents, made multiple false and damaging statements about
Plaintiff, including claims that he was "disruptive," had an "argumentative tone," and
exhibited "entitlement." In reality, Plaintiff's only "disruption" was objecting to being
treated in a manner inconsistent with the rights and respect afforded to him as an
AAdvantage® Platinum Pro member. His tone reflected frustration—not aggression—
and his words were in response to being denied basic services, publicly embarrassed, and
stripped of the status he had earned. When Plaintiff said, *"nobody treats me like shit,"* it
was not an outburst—it was a demand for decency. If Plaintiff had been receiving the
service he paid for and the treatment his status promised, he would have had no reason to
speak up, and certainly no reason to sue American Airlines.  These statements were made
in the presence of other passengers and American Airlines employees, including flight

crew and ground staff. The statements were repeated in post-flight reports and FAA investigation materials and contributed to Plaintiff's removal and subsequent ban.

26. FAA findings later revealed these statements to be unsupported, inconsistent with video evidence, and in some cases, directly false. As a result of these defamatory statements, Plaintiff's personal and professional reputation has been injured, and he continues to suffer ongoing social stigma.

## COUNT IV – VIOLATION OF 42 U.S.C. § 1981

*Plaintiff was denied the full and equal benefits of a contractual relationship based on class, status, and perceived ethnicity—while holding Platinum Pro privileges.*

30. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens.

31. Defendant treated Plaintiff differently based on appearance, perceived ethnicity, and non-revenue status, disregarding his Platinum Pro standing.

32. Defendant's employees chose to focus on Plaintiff's attire and pass classification, rather than the rights and benefits afforded by his actual loyalty tier and behavior.

33. Other passengers with paid fares, or more "professional" appearances, would not have been publicly shamed, mischaracterized, or removed under the same circumstances.

34. This constitutes a violation of Plaintiff's right to contract on equal terms without bias or discrimination.

## COUNT V – NEGLIGENT MISREPRESENTATION AND FAILURE TO TRAIN

*Defendant's employees falsely cited "federal law," failed to know internal policy, and escalated a non-issue into an incident—exposing systemic training failures.*

35. Celi misrepresented federal aviation law by asserting that use of the business-class lavatory by main cabin passengers was prohibited by federal law.

36. This misstatement was repeated to the captain, causing a cascading misjudgment that resulted in Plaintiff's removal.

37. American Airlines failed to properly train its crew regarding internal policy, AAdvantage® entitlements, non-revenue handling, and customer relations under stress.

38. Quiroz admitted she did not know Plaintiff's actual elite status. Sanchez stated he was a problem based on conduct later disproven.

39. Defendant had a duty to ensure crew members were trained to de-escalate situations and accurately understand policy. That duty was breached, causing Plaintiff harm.

## COUNT VI – INJUNCTIVE RELIEF

*Plaintiff seeks reinstatement of full access, formal acknowledgment of status, and injunctive relief to end ongoing interference with his right to travel.*

40. Plaintiff seeks injunctive relief to (1) compel reinstatement of his ability to fly on American Airlines; (2) enforce recognition of his AAdvantage® status; (3) compel retraction of defamatory internal findings; and (4) restore the privileges wrongfully denied.

41. On March 28, 2025, Defendant issued a letter reinstating Plaintiff's ability to fly. On April 7, 2025, Plaintiff was denied boarding despite holding a confirmed, paid ticket.

42. These facts demonstrate ongoing harm and a need for judicial intervention to restore

fairness, prevent further retaliation, and protect Plaintiff's rights.

43. Absent injunctive relief, Plaintiff remains at risk of continued bans, humiliation, denial of service, and commercial retaliation.

## V. LEGAL CLARIFICATIONS, PROCEDURAL HISTORY, AND ANTICIPATED DEFENSES

44. Plaintiff previously filed a civil action related to the events of June 3, 2022, which was dismissed without prejudice due to procedural error. That filing did not receive full consideration on the merits.

45. In parallel, the Federal Aviation Administration initiated an enforcement action proposing a $10,500 civil penalty against Plaintiff, alleging interference with crew and noncompliance.

46. On **October 8, 2024**, a full FAA hearing was conducted under Docket No. G13-23-021. On **November 7, 2024**, Administrative Law Judge Douglas M. Rawald issued an **Initial Decision**, rejecting the FAA's full penalty and reducing the matter to a minor regulatory issue under 14 C.F.R. § 91.11.

47. Key findings from that hearing included:

- **Flight Attendant Sanchez was found not credible** and contradicted by video.

- **Flight Attendant Quiroz misunderstood Plaintiff's status**, referring to him as "Gold" when he was "Platinum Pro."

- **Purser Celi's justification for denying the lavatory ("federal law") was false** and unsupported by any citation.

- **Captain Jafee did not testify**, submit a declaration, or verify the accuracy of the crew's reports.

48. No physical altercation, intoxication, or violent behavior was found. The FAA hearing confirmed that Plaintiff was **neither disruptive nor threatening**.

49. The FAA matter is **currently on appeal** by Plaintiff. No fine has been imposed to date. The underlying facts and crew inconsistencies from that proceeding are directly relevant to this civil complaint.

50. Defendant may raise defenses rooted in:

- The **Montreal Convention** (MC99): Inapplicable to non-physical injuries and to post-flight conduct such as banning and defamation.

  The **2022 Conditions of Carriage**: Superseded by 2024 terms, and do not bar lavatory access based on class.

- **Time-barred arguments**: Rebutted by **ongoing harm doctrine**, including the April 7, 2025 denial.

- **Res judicata**: Not applicable, as no decision was issued on the merits in prior filings.
- Plaintiff does not assert any cause of action under the **Air Carrier Access Act (ACAA)**, nor does he seek relief under any statute that does not afford a private right of action. All claims arise from valid federal and state causes of action, including breach of contract, defamation, retaliation, negligent misrepresentation, and civil rights violations under 42 U.S.C. § 1981. Any prior confusion has been fully clarified in this revised and properly structured pleading.

## VI. DAMAGES – ECONOMIC, EMOTIONAL, PROFESSIONAL, AND REPUTATIONAL

51. At the FAA hearing, the Administrative Law Judge expressly urged both parties to consider settlement. Plaintiff declined. He refused to settle for something he did not do. The case proceeded to a full hearing, where the FAA's proposed fine was significantly reduced, and key testimony from Defendant's flight crew was discredited. This was not an agreement or concession—it was a vindication of

Plaintiff's position. There was no settlement. There was no waiver. Plaintiff chose principle over convenience.

52. Defendant may argue that Plaintiff's claims are preempted by the Montreal Convention, or otherwise barred by federal statutes. These arguments fail. The **Montreal Convention does not apply to claims based on post-flight retaliation, ongoing bans, defamation, or denial of service in the domestic context**. See *King v. American Airlines, Inc.*, 284 F.3d 352, 357 (2d Cir. 2002) ("The Convention does not preclude claims that are not related to personal injury, baggage, or delay."); *Doe v. Etihad Airways*, 870 F.3d 406, 414 (6th Cir. 2017) (holding Convention inapplicable to claims outside the scope of international carriage).

53. Nor does Plaintiff assert any private cause of action under the Air Carrier Access Act (ACAA). Plaintiff's claims arise under state law (contract, defamation, tort) and federal civil rights law (42 U.S.C. § 1981). See *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002) ("The ACAA does not create a private right of action.").

54. Defendant may also raise Florida's "impact rule" to bar emotional damages. But Florida recognizes exceptions for intentional infliction of emotional distress. See *Gracey v. Eaker*, 837 So. 2d 348, 356 (Fla. 2002) (allowing emotional distress damages where the conduct is outrageous and intentional).

55. Finally, Defendant's March 28, 2025 letter stating Plaintiff was welcome to resume flying, followed by an April 7 denial of boarding, creates grounds for **judicial estoppel**. See *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (Judicial estoppel bars a party from asserting a position in litigation that contradicts a prior position accepted by a court or relied upon by an opposing party).

56. Plaintiff's denial of boarding on April 7, 2025—just ten days after receiving written reinstatement from American Airlines—was not incidental. It was a continuation of the pattern of retaliatory conduct that began on Flight 1124 and persisted even after the FAA partially

vindicated Plaintiff. American Airlines cannot now claim the matter is resolved while simultaneously denying Plaintiff the ability to travel. The March 28 letter and April 7 incident are not two isolated events—they are linked by cause and intent. This pattern of mistreatment falls outside the Montreal Convention, is not governed by the ACAA, and constitutes a valid basis for relief under well-established tort and civil rights law.

**56-A.** Defendant's September 3, 2024 email (Exhibit G) unequivocally stated that Plaintiff's travel privileges were permanently revoked and that "the matter was closed." Defendant claimed the ban was supported by Captain Jafee—who has never submitted a sworn statement or testified under oath. However, on March 28, 2025, Defendant issued a contradictory communication (Exhibit H), explicitly stating that Plaintiff was "welcome back" and expressing gratitude for his AAdvantage loyalty. This about-face was made without notifying the FAA or DOT, and without any disclosure to the Plaintiff that prior disciplinary positions were reversed. The contradiction between these communications supports judicial estoppel under *New Hampshire v. Maine*, 532 U.S. 742 (2001), and reveals a clear pattern of misrepresentation.

**57.** Accordingly, Plaintiff's claims are supported not only by the facts but by controlling and persuasive legal precedent. The legal doctrines cited above provide clear pathways for this case to proceed. The harm is ongoing, the rights asserted are valid, and the causes of action are properly pled. Defendant's prior defenses—based on preemption, time bars, and procedural technicalities—no longer apply. This is not a theoretical dispute; it is a real and continuing violation of a passenger's rights, reputation, and dignity. Plaintiff now turns to the specific causes of action.

## A. Emotional and Psychological Harm

- Diagnosed **Post-Traumatic Stress Disorder (PTSD)** following the events of Flight 1124, as documented by a licensed mental health professional.

- Onset of compulsive behavior, including **trichotillomania** (eyebrow pulling), following the incident.

- Anxiety and depression interfering with sleep, focus, and daily functioning.Panic during travel, avoidance of airports, and recurring intrusive memories of humiliation and removal.

**B. Reputational Harm**

- Video of Plaintiff's removal circulated online, accompanied by false public commentary alleging intoxication and aggression.

- Plaintiff, a known professional in multiple communities, has been **publicly associated with the incident**, damaging trust and credibility.

- Plaintiff's young son has been bullied and mocked by classmates who referenced the viral event.

- Community standing and professional network deteriorated due to misrepresentations originating from the airline's internal narrative.

**C. Professional and Economic Harm**

- Loss of a major client account on **April 7, 2025**, directly following the denial of boarding at MIA.

- Forced to rebook travel through **alternate carriers** (e.g., Spirit Airlines), incurring hours of additional travel time, higher costs, and lower-quality service.

- Decreased ability to conduct face-to-face client meetings, impacting income and business stability.

- Loss of future AAdvantage® rewards, vouchers, travel credits, and miles accumulated over years of loyalty.

**D. Relational and Familial Harm**

- Former fiancée **terminated the engagement** due to backlash from the incident and public humiliation.

16

- Strained co-parenting relationship with the mother of Plaintiff's son due to the ongoing public fallout.

- Decreased ability to travel freely to see Plaintiff's son in Barranquilla, Colombia, impairing the father-son relationship.

## E. Ongoing Harm – Post-Reinstatement

- March 28, 2025 reinstatement letter was relied upon in good faith.

- Plaintiff booked a paid ticket (Flight AA2280, April 7) and was still denied boarding—**a fresh violation**.

- Defendant has failed to explain, apologize, or correct this denial.

- This creates a **continuing tort** and bars dismissal on any theory of finality or closure.

**These damages are not speculative. They are documented, observable, and ongoing. Plaintiff does not seek sympathy—he seeks justice, accountability, and restoration.**

## VIII. <u>CAPTAIN JAFFEE'S ABSENCE, KOLB'S CONCEALMENT, AND QUIROZ'S IGNORANCE</u>

58. Central to Defendant's justification for Plaintiff's removal from Flight 1124 is the authority of **Captain Jaffee**, who allegedly made a safety-based decision relying on information provided by the crew.

59. However, **Captain Jaffee has never testified**, never submitted a sworn declaration, and has never appeared in any FAA or judicial proceeding related to this matter. His account —if it exists—has never been verified.

60. What remains, then, is a chain of secondhand, inaccurate, and contradicted statements, primarily from **Purser Rosa Celi, Flight Attendant Ana Maria Sanchez**, and **Flight**

**Attendant Maria Quiroz.**

61. The **FAA Initial Decision**, issued November 7, 2024, noted glaring discrepancies:

- Sanchez was found **not credible**, with multiple contradictions between her testimony and onboard video.

- Celi misrepresented policy by citing a **non-existent federal law**.

- Quiroz also admitted to **not understanding what the Gold tier entailed**, nor verifying Plaintiff's actual status before labeling him publicly.

62. These falsehoods—originating from Celi and Sanchez—were relayed to the captain without scrutiny. Maria Quiroz, rather than correcting these errors, acted on them and contributed to the escalation.

63. Despite the weight of this flawed testimony, **Captain Jaffee relied entirely on the crew's reports**—and then disappeared from the record. A pilot's decision carries weight in law only when it's **based on fact and independent judgment**. Here, there is no evidence that the captain made either.

64. At every turn, defense counsel **Kelly H. Kolb** has sought to insulate American Airlines from these truths:

- By **citing outdated Conditions of Carriage (2022)** while omitting the newer, applicable 2024 version;

65. These legal omissions, when coupled with factual misrepresentations, paint a picture of strategic concealment—not good faith defense. When the flight deck relies on misinformation, and the courtroom relies on silence, justice is denied at both 30,000 feet

and sea level.

## IX. DEFENDANT'S OWN RULES UNDERMINE THEIR DEFENSE

66. At the time of the incident on Flight 1124, Plaintiff held **Platinum Pro** status under the

AAdvantage® loyalty program. This tier carries the following published benefits:

- Complimentary alcoholic beverages in the Main Cabin;
- Complimentary preferred/Main Cabin Extra seating;
- Priority boarding and recognition;
- Enhanced customer service access;
- Treatment consistent with premium-tier expectations.

67. Neither the **2022 nor 2024 Conditions of Carriage** prohibit main cabin passengers from

using the forward lavatory under standard or reasonable circumstances.

68. No internal document or policy grants flight attendants the authority to cite **"federal**

**law"** as a basis to deny lavatory use when no such regulation exists.

69. Nevertheless, Purser **Rosa Celi** stated that it was against federal law for Plaintiff to use

the forward lavatory. When challenged, she offered no citation—because none exists.

70. The **2024 Conditions of Carriage**, which were in effect as of October 2024, supersede

prior editions and contain **no language** restricting lavatory access based on ticket class.

These terms were knowingly misrepresented by Defendant and ignored by its crew.

71. Plaintiff's treatment was not grounded in policy, law, or safety. It was rooted in bias—

reinforced by the public mention of his **D3 non-revenue status**, a humiliation that

violated American's own **Privacy Policy** and **employee Standards of Conduct**.

## X. THE MARCH 28 LETTER AND APRIL 7 DENIAL – ONGOING HARM AND JUDICIAL ESTOPPEL

72. On **March 28, 2025**, Defendant issued Plaintiff a letter stating:

> *"You are welcome to resume flying with American Airlines. You may use your AAdvantage account and book travel at your convenience."*

73. Relying on this statement, Plaintiff purchased a paid ticket for **Flight AA2280** from MIA to MCO, scheduled for **April 7, 2025**, confirmation code **ECHYQR**.

74. The ticket was confirmed, linked to his AAdvantage® account, and fully paid ($152.48). Plaintiff had a confirmed seat and no restrictions were flagged.

75. However, upon arrival at Miami International Airport, Plaintiff was **denied boarding without explanation** and informed by staff that he was "still banned."

76. No refund was issued. No update was made to his AAdvantage® account. Defendant has failed to address or explain the contradiction between its written reinstatement and its refusal to honor a valid, revenue-paid ticket.

### A. Ongoing Harm

77. The April 7 denial demonstrates that the harm suffered by Plaintiff is **not past—it is present and continuous.** Plaintiff relied on the March 28, 2025 letter in good faith and purchased a paid ticket on April 7. He was subsequently denied boarding—not because of any misconduct, but because Defendant continued enforcing a ban that, by their own account, had been lifted. The September 2024 communication closing the matter, followed by a reinstatement and then renewed denial, constitutes both retaliation and intentional misrepresentation. It shows that Plaintiff continues to suffer ongoing harm as a direct result of Defendant's inability to speak the truth in one consistent voice.

78. Every day Plaintiff is unable to fly, he suffers reputational, financial, emotional, and logistical harm—including loss of clients, extended travel delays, and impaired ability to parent his son across borders.

**B. Judicial Estoppel**

79. Defendant cannot take one position before Plaintiff and regulators—that he has been reinstated—while enforcing a contradictory position at the gate.

80. If reinstated, then the April 7 denial is a fresh breach If not reinstated, then the March 28 letter was a **misrepresentation**, delivered to delay, discredit, or derail Plaintiff's pursuit of truth.

81. Either way, **Defendant is estopped** from denying the active nature of this claim or the authenticity of Plaintiff's grievance.  One cannot be welcomed "back to flying" in writing and barred from boarding in practice. That is not law—it's fraud.

## XI. CONCLUSION: DIGNITY, JUSTICE, AND THE RIGHT TO BE TREATED FAIRLY

82. This is not just about a lavatory. It is not just about a policy misread or a denied drink.

This is about how one of the world's largest airlines chose to humiliate, discredit, and discard a loyal customer—because of how he looked, how he traveled, and who he was.

83. Plaintiff was treated differently not because of a rule—but because of a **label**: D3. That label allowed crew members to disregard his actual **Platinum Pro** status, deny him privileges, and treat him as a nuisance rather than a customer.

84. The flight crew lied. The captain never verified. Counsel concealed the truth. And even after Plaintiff was reinstated on paper, he was still denied access at the gate.

85. Through it all, Plaintiff has not asked for revenge. He has asked for **respect**—the kind his father earned over decades of service to this airline. The kind that every customer, every status holder, every human being deserves.

86. Plaintiff has endured humiliation, PTSD, loss of business, damage to his relationship with his son, and the end of an engagement. And still, he files this **not just for himself**, but for the next person wearing a bandana, sitting in coach, asking for basic dignity.

87. For every rule American Airlines wrote and failed to follow, for every silence it maintained while calling it a response, for every time it said "you are welcome back" and proved otherwise—**Plaintiff now turns to this Court**.

88. Plaintiff respectfully submits this Complaint, complete with updated facts, governing policies, and judicial findings. He seeks:

- Reinstatement of his ability to fly and use his AAdvantage account
- Acknowledgment that his treatment violated internal and federal standards
- An injunction preventing further retaliatory conduct
- Compensatory/punitive damages for financial loss, reputational harm, and emotional distress
- A public correction of the internal narrative that continues to follow him

89. Plaintiff fully participated in the FAA enforcement process, appearing pro se, submitting exhibits, and cross-examining witnesses.

90. A partial ruling in Plaintiff's favor was issued. Plaintiff is currently pursuing an administrative appeal and has raised relevant facts already contained within the record.

91. This civil action is not duplicative—it addresses damages, reputational injury, and injunctive relief unavailable in the administrative forum.

92. On April 8, 2025, Defendant's counsel, Kelly Kolb, sent Plaintiff an unsolicited email referencing Plaintiff's social media activity. This message, sent in the midst of active litigation, reflects continued monitoring and a retaliatory tone, and appears to punish Plaintiff for speaking publicly about his experience. The message confirms Defendant's awareness of the emotional and reputational harm caused, yet offers no apology, remedy, or corrective action. Instead, it underscores Defendant's hostility toward Plaintiff's constitutionally protected expression and supports Plaintiff's claim of intentional infliction of emotional distress and ongoing harm.

**93. PLAINTIFF RESTS ON FILING.**

## XII. EXHIBIT LIST

*(Filed in support of Plaintiff's Civil Complaint and Opposition to Motion to Dismiss)*

**Exhibit A** – Plaintiff's AAdvantage® Membership Summary, showing Platinum Pro and Admirals Club status.

**Exhibit C** – FAA Initial Decision, Docket No. G13-23-021 (Selected Pages), establishing that crew members failed to de-escalate, Plaintiff posed no threat, and that the penalty was reduced due to mitigating factors.

**Exhibit D** – Snapshot of Flight Crew Device (Exhibit C-16), showing that Plaintiff's

AAdvantage® Platinum Pro, Admirals Club, and D3 non-revenue designations were all visible to flight crew.

**Exhibit G** – American Airlines Email dated September 3, 2024, declaring the matter closed and

affirming Plaintiff's permanent ban, allegedly supported by Captain Jafee.

**Exhibit H** – American Airlines Letter dated March 28, 2025, stating Plaintiff is welcome to resume travel, directly contradicting Exhibit G.

**Exhibit I** – Paid Reservation Itinerary for Flight AA2280 (April 7, 2025), Confirmation Code: **ECHYQR**, showing Plaintiff was denied boarding after reinstatement.

**Exhibit J** – AAdvantage® Terms and Conditions, effective March 1, 2024, establishing rights and benefits of Plaintiff's status.

**Exhibit K** – American Airlines Conditions of Carriage (2022 and 2024 versions), illustrating changes in terms and undermining Defendant's reliance on the outdated 2022 version.

**Exhibit L** – Email from Kelly Kolb dated April 8, 2025, acknowledging he was unaware of the March 28, 2025 reinstatement letter at the time of earlier filings.

**Respectfully submitted,**

John Nuñez
Pro Se Plaintiff
14475 SW 23rd Street
Miami, Florida 33175
johnnunez@ymail.com
(786) 425-1966

Date: 04/08/2025

**EXHIBIT A**

# Plaintiff's AAdvantage® Platinum Pro Membership Summary

Demonstrates Plaintiff's elite status and entitlement to certain privileges and recognition at the time of the incident.

# American Airlines

PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®

John

## Activity

« Back to your account

**John Nunez**
*AAdvantage® member since: Mar 31, 2015*

| Award Miles | Loyalty Points | Million Miler |
|---|---|---|
| 3,986 | 924 | 121,225 |

Helpful links
Request missing flight miles
Buy Miles
AAdvantage program updates
Earn and redeem miles with American



**AAdvantage Gold®
status**

40,000 Loyalty Points

**AAdvantage Plati
status**

75,000 Loyalty Points

# Enjoy the best of travel with AAdvantage Executive Platinum® status

American Airlines AAdvantage Executive Platinum® status offers the highest level of travel comfort and flexibility. You made it to the top – now enjoy every moment.

## Key benefits

  English ▾    Search AA.com® 🔍

  **Plan Travel Travel Informatio AAdvantage®**    Log in

🏠 Home  ›  AAdvantage® program  ›  AAdvantage® terms and conditions

# AAdvantage® terms and conditions

Updated January 1, 2024

## Introduction

The following terms are effective on March 1, 2024 and thereafter until modified.

All AAdvantage® mileage, Loyalty Points, all AAdvantage® tiers and programs including ConciergeKey® and Million Miler™ ("AAdvantage® Status"), awards, award tickets, rewards, gifts and any other benefits that American Airlines offers in the AAdvantage® program (collectively, "AAdvantage® Rewards and Benefits") are conditioned upon your acceptance of and compliance with (i) these terms and conditions (the "AAdvantage® Program Terms and Conditions" or "Terms and Conditions"), (ii) the terms and conditions described elsewhere throughout this website or app, including the aa.com usage terms, and the pages and widgets specifically relating to the AAdvantage® program, American Airlines' fare rules, and all other applicable American Airlines rules and policies (the foregoing, "the AAdvantage® Program Rules", and together with the Terms and Conditions, collectively, the "AAdvantage® Program Agreement") and (iii) the American Airlines conditions of carriage. The American Airlines conditions of carriage are available on aa.com, from any American Airlines airport representative or American Travel Center representative. By enrolling and participating in the AAdvantage® program, or by your use of any benefit or reward under the AAdvantage® program if you are not already an AAdvantage® member, you agree to be bound by and accept the AAdvantage® Program Agreement and the American Airlines conditions of carriage, and acknowledge that you have read the American Airlines privacy policy, which may be viewed at aa.com/privacy. If you transfer, to the extent permitted by American Airlines, any AAdvantage® Rewards and Benefits to another person who is not already an AAdvantage® member, you will notify that person of the "AAdvantage® Program Terms and Conditions."

You are responsible for reading the AAdvantage® Program Agreement, additional member information, AAdvantage® newsletters, and account details available in your online AAdvantage® account in order to understand your rights, responsibilities, and AAdvantage® Rewards and Benefits under the AAdvantage® program.

AAdvantage® Rewards and Benefits and their use with American Airlines products and services are only for your personal benefit and use through your personal AAdvantage® account and they cannot be sold, advertised for sale or bartered or accessed or used by anyone else except as expressly permitted in the AAdvantage® Program Agreement. Violation of these terms and conditions can lead to loss of AAdvantage® Rewards and Benefits and termination of your account.

American Airlines offers the AAdvantage® program at its discretion and has the right to terminate the AAdvantage® program, in whole or in part, or to change or amend the AAdvantage® Program Agreement, in whole or in part, at any time, even if the changes affect the value of AAdvantage® Rewards and Benefits already accumulated. The AAdvantage® Program Agreement is subject to change at any time without notice. Please check back frequently for AAdvantage® program updates or rule changes.

Three bags are better than one. Plus, AAdvantage Executive
Platinum® status comes with Priority handling so your bag can be
among the first to arrive at baggage claim. This benefit also applies to
up to 8 passengers traveling with you in the same reservation.

Learn more  >



## Priority check-in, security and Group 1 boarding ⓘ

As an AAdvantage Executive Platinum® status member, you can save
time at the airport with Priority check-in, exclusive security screening
lanes at select airports, and being among the first to board the plane.

Learn more  >



## Complimentary food and drinks in the Main Cabin

AAdvantage Executive Platinum® members traveling in the Main
Cabin on board American Airlines can enjoy a complimentary
beverage from our standard alcoholic beverage* selections as well as
1 snack. The snack includes any food item on our menu.

*On flights with full drink service. The number of drinks served may be limited.

**EXHIBIT B.**

# Excerpts from FAA Initial Decision – Docket No. G13-23-021

(Pages 4–8, 13–15)

Confirms the FAA reduced the penalty after finding no intoxication, conflicting testimony, and mitigation based on Plaintiff's medical needs and flight crew escalation.

jump seats in the rear of the aircraft.[16]

The Respondent boarded the aircraft in Barranquilla as a non-revenue passenger (also referred to as a "D3 passenger") and was seated in his assigned seat, seat 17C, located in the main cabin of the aircraft.[17] As a non-revenue passenger, the Respondent had obtained his ticket by only paying for the taxes on the ticket price due to his father's long-time employment by American Airlines.[18]

On the date of the flight, the Respondent was suffering from benign prostatic hyperplasia (an enlarged prostate) as well as kidney stones, which resulted in the need to use the bathroom to urinate frequently with urgency.[19] After takeoff, the Respondent left his seat and tried to use the lavatory located in the business class section at the front of the aircraft.[20] The purser told the Respondent that he could not use the business class lavatory because he was seated in the main cabin.[21] The Respondent became upset and frustrated after being denied access to the business class lavatory.[22] Because of his frequent flyer status, the Respondent believed he should have been allowed to use the business class lavatory and so felt he had been unjustly denied access.[23] He then walked to the rear of the aircraft to use one of the lavatories in the main cabin.[24] When he got to the rear of the aircraft, the Respondent complained to Ms. Quiroz and Ms. Sanchez about the fact that he had been denied access to the business class lavatory.[25] Both flight attendants were seated in jump seats in the rear galley at that time while the Respondent stood over them.[26] The Respondent yelled at the flight attendants while expressing his frustration about being denied access to the business class lavatory.[27] The Respondent complained about his perceived mistreatment, waving his hands while speaking loudly, including stating, "nobody treats me like shit."[28] In response to the Respondent's tirade, the flight attendants told the

---

[16] *See* Hearing Transcript at 21-22.
[17] *See* Hearing Transcript at 33, 64, and 156; Ex. C-5; Ex. C-6; and Ex. R-9.
[18] *See* Hearing Transcript at 33 and 140.
[19] *See* Hearing Transcript at 140 and 143; Ex. R-3a; and Ex. R-3d. While the Respondent's medical records postdate the date of the incident, Complainant did not provide any evidence to rebut the Respondent's credible testimony that he suffered from this condition on the date of the flight.
[20] *See* Hearing Transcript at 143 and 156-158 and Ex. R-9.
[21] *See* Hearing Transcript at 21; Ex. C-6; and Ex. R-9.
[22] *See* Hearing Transcript at 158.
[23] *See* Hearing Transcript at 157-158.
[24] *See* Hearing Transcript at 21-23 and 158 and Ex. R-9.
[25] *See* Hearing Transcript at 21 and 158 and Ex. R-9.
[26] *See* Hearing Transcript at 21 and Ex. R-9.
[27] *See* Hearing Transcript at 21, 23-24, 150, and 158-159; and Ex. C-6; and Ex. R-9.
[28] *See* Hearing Transcript at 21, 24, 29,144, and 145 and Ex. R-9.

Respondent that he should know the rules and that he was acting inappropriately when he should in fact be on his best behavior as a non-revenue passenger.[29]  The Respondent then used one of the lavatories at the rear of aircraft and then returned to his seat.[30]  Sometime thereafter, the Respondent got up from his seat and once again went to the back of the aircraft to use the lavatory.[31]  As he approached the rear of the aircraft, Ms. Sanchez placed the beverage cart in the aisle to block him from approaching the flight attendants, denying him access to the lavatory.[32]  The Respondent expressed his frustration at not being able to use the lavatory, once again yelling at the flight attendants.[33]  This included stating that Ms. Quiroz was a "fucking idiot" and "stupid."[34]

At some point during the flight, the Respondent requested the flight attendants provide him an alcoholic beverage, which the flight attendants refused to serve him because they suspected that he may have been intoxicated due to his level of agitation.[35]  The Respondent felt he was entitled to a beverage given his status as a platinum executive pro passenger, American Airlines' highest level of frequent flyer status, at the time of the flight.[36]  This denial added to the Respondent's level of frustration.[37]  The flight attendants subsequently decided that they could not complete beverage service for the flight because of their interactions with the Respondent.[38]

After returning to his seat from his second trip to the back of the aircraft, the Respondent received a disturbance card from the purser, Ms. Celi.[39]  In response, he once again expressed his frustration in a forceful manner.[40]  Ms. Celi then reported this interaction to the captain.[41]  Based upon the reports he had received regarding the Respondent's behavior, Captain Jaffe decided to divert the plane and return to Barranquilla, Colombia.[42]  Upon landing in Barranquilla, the Respondent deplaned in the company of an American Airline employee.[43]  As he left the aircraft,

---

[29] *See* Hearing Transcript at 26 and Ex. R-9.
[30] *See* Hearing Transcript at 22-23 and Ex. R-9.
[31] *See* Hearing Transcript at 150 and 163.
[32] *See* Hearing Transcript at 26, 27, 150, and 163 and Ex. C-14.
[33] *See* Hearing Transcript at 26, 28, and 164.
[34] *See* Hearing Transcript at 26-27 and Ex. R-9.
[35] *See* Hearing Transcript at 22, 38, and151-152; Ex. C-6; and Ex. R-9.
[36] *See* Hearing Transcript at 168-171.
[37] *See* Hearing Transcript at 168-171.
[38] *See* Hearing Transcript at 30.
[39] *See* Hearing Transcript at 27; Ex. C-6; and Ex. R-9
[40] *See* Hearing Transcript at 27; Ex. C-6; and Ex. R-9.
[41] *See* Hearing Transcript at 28 and Ex. C-5.
[42] *See* Hearing Transcript at 38; Ex. C-5; Ex. R-9; Complaint at 3; and Answer at 2.
[43] *See* Ex. C-15 and Ex. R-5a.

the Respondent told the captain, "I'm a non-rev who wanted a coke."[44]  After exiting the aircraft in Barranquilla, the Respondent requested a breathalyzer test.[45]  The results of the test revealed that the Respondent was not intoxicated at the time he deplaned.[46]

## 5.  Significant Credibility Determinations

In coming to a decision in this case, the undersigned judge made the following significant credibility determinations.

### a.  *The testimony and statement from Maria Quiroz are generally credible.*

The testimony provided by Ms. Quiroz remained consistent with the information provided in her written statement made close in time to the incident.  For example, Ms. Quiroz's testimony that shortly after takeoff the Respondent came to the rear of the aircraft and yelled at her and Ms. Sanchez about being denied access to the business class lavatory, including saying that "nobody treats me like shit," was consistent with the statement Ms. Quiroz wrote on June 4, 2022.[47]  There are additional similarities between Ms. Quiroz's testimony and her written statement in how she described the Respondent getting frustrated after being denied the alcoholic beverage he requested, Ms. Sanchez using the beverage cart as a barrier when the Respondent tried to access the rear lavatory a second time, and Ms. Celi delivering a disturbance notice to the Respondent given his behavior.[48]  Further, in both her statement and her testimony, Ms. Quiroz explained that the captain made the decision to return to Barranquilla based upon reports he received regarding the Respondent's behavior.[49]  This consistency over time increases her testimony's credibility.

### b.  *The Respondent's testimony is credible.*

The undersigned judge acknowledges that the Respondent is a party to this proceeding and so is therefore biased, but that does not mean his testimony is inherently unreliable.  The testimony of respondents should be subjected to the same credibility analysis as any other witness, which includes bias as one of the many factors to consider.  Most notably, the Respondent's testimony was consistent with other evidence in the record, making it more credible.  For example, the

---

[44] *See* Ex. R-5a.
[45] *See* Hearing Transcript at 187-188.
[46] *See* Hearing Transcript at 125, 186, and 194-195.
[47] *Compare* Hearing Transcript at 21 *with* Ex. R-9.
[48] *Compare* Hearing Transcript at 22, 26-28, 38, and 39 *with* Ex. R-9.
[49] *Compare* Hearing Transcript at and 28-29, 38, 43, and 46-47 *with* Ex. R-9.

Respondent's testimony that he suffers from an enlarged prostate and kidney stones that result in the need to use the bathroom frequently is consistent with his medical records.[50]  Similarities exist between the testimony of Mr. Nunez and Ms. Quiroz in that they both agree Mr. Nunez left his seat shortly after takeoff to use the bathroom, Mr. Nunez used the lavatory in the rear of the aircraft after being denied access to the business class lavatory, and the Respondent was not served the alcoholic beverage he requested.[51]  Additionally, Mr. Nunez's testimony that he was not intoxicated during the subject flight is supported by the credible testimony of Major Diego Pineda.  Major Pineda explained that the Respondent appeared sober and calm upon deplaning and that the results of a breathalyzer test performed after the Respondent exited the aircraft upon landing in Barranquilla found the Respondent was not intoxicated.[52]

Additionally, the Respondent was willing to admit facts that did not put him in the best light. Specifically, the Respondent admitted that he was frustrated and felt disrespected by the flight attendants given his non-revenue status.[53]  Similarly, the Respondent admitted that he did tell the flight attendants that they couldn't treat him like "shit,"[54] and acknowledged that he is a passionate person who talks with his hands.[55]  He further admitted talking loudly to the flight attendants.[56]  This willingness to admit facts against his interests increases the overall credibility of his testimony.

c.  *Ms. Sanchez's testimony is not supported by the record and so is less credible.*

Ms. Sanchez's credibility is negatively impacted by the failure of much of her testimony to be included in her written report and the fact that several of her assertions made while testifying are not supported by the record as a whole and are inconsistent with other evidence in the record. In completing this analysis, the undersigned judge first notes the lack of detail provided in Ms. Sanchez's written statement, which was only two sentences long.[57]  And second, and most importantly, the undersigned judge observes there are numerous instances where the evidence in the record demonstrates her testimony appears exaggerated.  For example, Ms. Sanchez testified that she had to move all of the passengers seated near the Respondent because they were afraid

---

[50] *See* Ex. R-3a and Ex. R-3d.
[51] *Compare* Hearing Transcript at 149-152 *with* Hearing Transcript at 21, 27, and 38.
[52] *See* Hearing Transcript at 184-186, and 190.
[53] *See* Hearing Transcript at 141, 145, 150, and 158-159.
[54] *See* Hearing Transcript at 144.
[55] *See* Hearing Transcript at 145.
[56] *See* Hearing Transcript at 164.
[57] *See* Ex. R-8.

of him.[58]  A video depicting the Respondent as he was asked to leave the plane, however, clearly shows passengers seated in the seats around him.[59]  In another example, the evidence in the record does not support Ms. Sanchez's assertion that the Respondent may have been going to hit her at the time she used the beverage cart to block his path to the lavatory.[60]  The video she took at the time she reportedly feared for her safety does not show the Respondent in close vicinity to her or the beverage cart, nor does it document him screaming any profanities at her or Ms. Quiroz.[61]  Instead, he appears to be simply walking back to his seat.  In considering the record as a whole, Ms. Sanchez's testimony seems embellished and exaggerated, rather than consistent with and supported by the other evidence in the case.

    *d.  The written statement of Ms. Celi is credible.*

The statement provided by Ms. Celi was consistent with the testimony provided by Ms. Quiroz and Mr. Nunez, as well as the written statement provided by Ms. Quiroz.  For example, Ms. Celi's assertions that the Respondent yelled at the flight attendants aboard the aircraft and was denied the alcoholic beverage he requested is corroborated by the testimony provided at the hearing by Ms. Quiroz and Mr. Nunez, as well as Ms. Quiroz's written statement.[62]  Additionally, Ms. Celi's report that the Respondent was upset after being denied access to the business class lavatory was consistent with the testimony provided by Ms. Quiroz at the hearing and Ms. Quiroz's written statement.[63]  Further, the testimony and written statement of Ms. Quiroz support the assertions in Ms. Celi's written statement that she provided the Respondent with a disruptive passenger notice and that the flight crew did not initially know the Respondent was flying as a non-revenue passenger.[64]  Lastly, Ms. Celi's assertion in her written statement that the Respondent felt disrespected was corroborated by the Respondent's credible testimony at the hearing.[65]

    *e.  The testimony of Rebecca Habib merits little to no weight.*

Although Ms. Habib was not a party to this proceeding, she exhibited a strong bias against the Respondent given her dislike for the Respondent after observing him while in the VIP lounge

---

[58] *See* Hearing Transcript at 59.
[59] *See* Ex. C-15.
[60] *See* Hearing Transcript at 54 and 56-57.
[61] *See* Ex. C-14.
[62] *Compare* Ex. C-6 *with* Hearing Transcript at 21, 22, 24, 25, 38, 151-152, and 164 and Ex. R-9.
[63] *Compare* Ex. C-6 *with* Hearing Transcript at 21 and Ex. R-9.
[64] *Compare* Hearing Transcript at 26-28, 33, and 39 and Ex. R-9 *with* Ex. C-6.
[65] *Compare* Ex. C-6 *with* Hearing Transcript at 141.

An appropriate civil penalty must reflect the totality of the circumstances surrounding the violation, while providing enough substance to serve as a deterrent to both the current violator and the industry as a whole in order to promote the goal of safety.[84]  Section g of Paragraph 6 of Chapter 9 of FAA Order No. 2150.3C provides a non-exhaustive list of mitigating or aggravating factors and elements that may be considered:

> 1. degree of hazard; 2. Violation history; 3. Level of certificate and experience; 4. Compliance disposition of violator; 5. Systematic/isolated violations; 6. Corrective action; 7. Inadvertence; 8. Voluntary reporting of violations; and 9. Criminal conviction.[85]

While the undersigned judge is not expressly required to follow the provisions of FAA Order No. 2150.3C,[86] it does provide guidance.[87]  Further, the Administrator has stated that "similar criteria should be considered in assessing civil penalties in non-hazardous materials types of cases"[88] to the following statutorily required factors in considering a civil penalty involving hazardous materials violations:

> (1) the nature, circumstances, extent, and gravity of the violation; (2) with respect to the violator, the degree of culpability, any history of prior violations, the ability to pay, and any effect on the ability to continue to do business; and (3) other matters as justice may require.[89]

The undersigned judge considered all of the pertinent factors to assess a civil penalty that will deter future violations by the Respondent and members of the flying public.  In considering the relevant factors, it is important to note that the Respondent did not provide evidence of financial hardship regarding his ability to pay a sanction.

In closing argument, Complainant's counsel explained that, in determining the proposed civil penalty, the Complainant deemed the applicable section of FAA Order No. 2150.3C to be "[i]nterference with crewmember," a severity level 2 violation.[90]  Complainant's counsel further argued that the Respondent's actions in this case were reckless or intentional.[91]  In support of this argument, Complainant's counsel contended that the Respondent "admitted to being upset

---

[84] *See In re Toyota Motor Sales, USA, Inc.*, FAA Order No. 1994-28 at 11 (Order and Decision, Sept. 30, 1994); *In re Charter Airlines, Inc.*, FAA Order No. 1995-8 at 28 (Decision and Order, May 9, 1995).

[85] *See* Ex. C-17 at 7-9 (FAA Order No. 2150.3C at 9-7 through 9-9).

[86] *See Folsom's Air Service, Inc.*, FAA Order No. 2008-11 at 14 (Decision and Order, November 6, 2008) (finding that because administrative law judges are not agency personnel, they are not expressly required to follow the guidance provided in FAA Order No. 2150.3A.).

[87] *See In re Air Carrier*, FAA Order No. 1996-19 at 7 (Decision and Order, June 4, 1996) (*citing Northwest Airlines, Inc.*, FAA Order No. 1990-37 at 8).

[88] *In re Luxemburg*, FAA Order No. 1994-18 at 6 (Order and Decision, June 22, 1994) (*citing Northwest Airlines, Inc.*, FAA Order No. 1990-37 at 12 n. 9).

[89] 49 U.S.C. § 46301(e).  *See also* 14 C.F.R. § 13.16(c).

[90] *See* Hearing Transcript at 214 and Ex. C-17 at 30 (FAA Order No. 2150.3C at 9-30 (Fig. 9-9-i(2))).

[91] *See* Hearing Transcript at 214.

and frustrated."[92]  The undersigned judge agrees that the interference was reckless.  The Respondent, a loud talker who uses his hands when impassioned, seemingly did not appreciate how distracting he was being when he attempted to express his frustration over how he felt he had been disrespected during the flight because of his status as a non-revenue passenger.  The Respondent acted recklessly, though, when he let his frustration get the best of him, resulting in him raising his voice and using profanity, which then interfered with the ability of multiple crewmembers to perform their duties.

According to the FAA's enforcement guidance, a civil penalty in the high range, from $7,500 to $10,500, is recommended for a reckless severity level 2 interference violation.[93]  The starting point for discussion should be the midpoint of this range, which is $9,000.[94]

As previously explained, the undersigned judge has found facts that were less severe than those alleged by the Complainant in support of its proposed civil penalty.  The undersigned judge deems these less severe facts merit consideration of a less severe penalty range.  Specifically, as already discussed, the preponderance of the evidence does not support a finding that the Respondent threatened any flight crewmembers.  In addition to these less severe facts, the undersigned judge further finds there are other factors to consider.[95]  For example, these very experienced flight attendants could have possibly used their de-escalation training to defuse this situation prior to having to involve the captain.  Instead, they seemingly made matters worse by arguing with the Respondent, raising their own voices and chastising him for how he was acting as a non-revenue passenger, and at one point denying him access to the lavatory despite his urgent need to urinate.

Finally, the undersigned judge finds it mitigating that the Respondent was suffering from an enlarged prostate as well as kidney stones, resulting in the need to use the bathroom frequently with urgency, and experienced excruciating pain when denied the use of the lavatory.  Such angst provides some explanation for his frustration and behavior, though it does not justify his distracting the flight attendants from their important safety duties.  Accordingly, in light of all the circumstances in the case, the undersigned judge finds a civil penalty in the moderate range,

---

[92] *See* Hearing Transcript at 214.
[93] *See* Ex. C-17 at 4-5 (FAA Order No. 2150.3C at 9-4 through 9-5 (Figs. 9-1 and 9-2)).
[94] *See* Ex. C-17 at 3 (FAA Order No. 2150.3C at 9-3, Chap. 9, ¶ 6(b)(2) (stating "[c]ounsel begins with a sanction at the midpoint of the applicable range...")).
[95] Complainant's counsel argued that no mitigating factors existed in this case while two aggravating factors existed, the degree of hazard and the diversion of a flight with over 100 passengers. *See* Hearing Transcript at 216-218.

$4,500 to $7,500,[96] to be appropriate.  Given the overall circumstances, a civil penalty in the amount of $4,500 is appropriate for the Respondent's violation of 14 C.F.R. § 121.580.

Therefore, pursuant to 14 C.F.R. § 13.205(a)(9), **IT IS HEREBY FOUND**:

1. During the subject flight, the Respondent interfered with the ability of crewmembers to perform their duties, in violation of 14 C.F.R. § 121.580.

2. The Complainant failed to prove by a preponderance of the reliable, probative, and substantial evidence that the Respondent threatened a crewmember in the performance of their duties.

**AND ORDERED:** the Respondent shall pay a civil penalty in the amount of $4,500.[97]

DOUGLAS M. RAWALD
Administrative Law Judge

Attachments:
1. Service List
2. Appendix 1: Complainant's Exhibits
3. Appendix 2: Respondent's Exhibits

---

[96] *See* Ex. C-17 at 4-5 (FAA Order No. 2150.3C at 9-4 through 9-5 (Figs. 9-1 and 9-2)).

[97] Pursuant to 14 C.F.R. § 13.233(a), "A party may appeal the administrative law judge's initial decision, and any decision not previously appealed … pursuant to §13.219, by filing a notice of appeal in accordance with § 13.210 no later than 10 days after entry of the oral initial decision on the record or service of the written initial decision on the parties.  The party must serve a copy of the notice of appeal on each party in accordance with § 13.211."  The party must then file an appeal brief within 50 days from the date of service of this order. *See* 14 C.F.R. § 13.233(c).

**EXHIBIT C**

# Flight Crew Passenger Display Snapshot – "Exhibit C-16"

Image of the onboard tablet screen showing Plaintiff's D3 non-revenue status and travel record, which was improperly disclosed and used to demean Plaintiff.

17C · Núñez, John                                    ⊗

AAdvantage: AAdvantage Platinum Pro
Other: ADM, CLUB, D3

Inbound                        Outbound

No information                 No information
available                      available

Sales

Refund                    Swap

**EXHIBIT D**

# Transcript Excerpt – FAA Hearing (October 8, 2024)

(Pages 21–22)

Sworn testimony from flight attendant Maria Quiroz stating that Purser Rosa Celi cited a non-existent "federal law" as justification to deny Plaintiff use of the forward lavatory.

21

Trial

John Nunez                                                    10/8/2024

1       A.    Well, he was a passenger on my flight from
2  Barranquilla two years ago.
3       Q.    Okay.  And do you recall what happened on that
4  flight, if anything?
5       A.    Yes.  After we took off, like 20 minutes after
6  departure, I was sitting at the back with my friend Ana
7  Maria, in our jump seats at the back.  So, Mr. Nunez came
8  and approached me, and he was complaining because the
9  purser didn't allow him to use the lavatory in the
10  business class.  And I was sitting in my jump seat, and
11  he approached to my face, and he was yelling why she
12  denied him.
13          And I explained the situation that there is a
14  federal law that all the flights that are going to the
15  United States, passengers must use the lavatories where
16  the seat belongs.  And he told me that he was a good
17  passenger and nobody treated him like shit.  So, he was
18  very loud.  So Ana Maria stood up, and she told him to
19  relax and he didn't need to yell at us.  He replied, I'm
20  not talking to you.  So, I told him, well, you can use
21  the lavatories that are open.  So, I went to the front to
22  talk to the purser and report the situation, and she
23  called the captain.
24          We gave him all the information, where he was
25  sitting, his name, and everything.  So, the purser, the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

22

Trial

John Nunez                                          10/8/2024

1    two flight attendants -- me and my other friend -- we
2    decided not to serve alcohol during the service.  So I went
3    to the back to start the service, and Mr. Nunez called me
4    and asked me for rum and coke.  And I told him --
5            JUDGE RAWALD:  Ma'am, if you could, I don't mean
6    to interrupt you.  So, you're -- very narrative, Ms.
7    Villiers, so I need to have more questions of what's
8    going on.
9            MS. VILLIERS:  Yes.
10           JUDGE RAWALD:  And I have some follow-up questions
11   I need to ask and clarify first before we go further.
12           So, ma'am, you said that Mr. Nunez said that he
13   was told he could not use the front lavatory by the purser.
14   Is that what you said, the purser?
15           MS. QUIROZ:  Yes.
16           JUDGE RAWALD:  Okay.  And who is the purser?  What
17   is that job on the aircraft?
18           MS. QUIROZ:  Of the purser?
19           JUDGE RAWALD:  Yes, ma'am.
20           MS. QUIROZ:  She assists the passengers in
21   business class, and she's the supervisor of the plane.
22           JUDGE RAWALD:  Okay.  And then I heard you mention
23   that he was told by Ms. Sanchez that he could use the
24   bathroom in the back of the aircraft.  Did he, at that
25   point, use the bathroom in the back of the aircraft?

and frustrated."[92]  The undersigned judge agrees that the interference was reckless.  The Respondent, a loud talker who uses his hands when impassioned, seemingly did not appreciate how distracting he was being when he attempted to express his frustration over how he felt he had been disrespected during the flight because of his status as a non-revenue passenger.  The Respondent acted recklessly, though, when he let his frustration get the best of him, resulting in him raising his voice and using profanity, which then interfered with the ability of multiple crewmembers to perform their duties.

According to the FAA's enforcement guidance, a civil penalty in the high range, from $7,500 to $10,500, is recommended for a reckless severity level 2 interference violation.[93]  The starting point for discussion should be the midpoint of this range, which is $9,000.[94]

As previously explained, the undersigned judge has found facts that were less severe than those alleged by the Complainant in support of its proposed civil penalty.  The undersigned judge deems these less severe facts merit consideration of a less severe penalty range.  Specifically, as already discussed, the preponderance of the evidence does not support a finding that the Respondent threatened any flight crewmembers.  In addition to these less severe facts, the undersigned judge further finds there are other factors to consider.[95]  For example, these very experienced flight attendants could have possibly used their de-escalation training to defuse this situation prior to having to involve the captain.  Instead, they seemingly made matters worse by arguing with the Respondent, raising their own voices and chastising him for how he was acting as a non-revenue passenger, and at one point denying him access to the lavatory despite his urgent need to urinate.

Finally, the undersigned judge finds it mitigating that the Respondent was suffering from an enlarged prostate as well as kidney stones, resulting in the need to use the bathroom frequently with urgency, and experienced excruciating pain when denied the use of the lavatory.  Such angst provides some explanation for his frustration and behavior, though it does not justify his distracting the flight attendants from their important safety duties.  Accordingly, in light of all the circumstances in the case, the undersigned judge finds a civil penalty in the moderate range,

---

[92] *See* Hearing Transcript at 214.
[93] *See* Ex. C-17 at 4-5 (FAA Order No. 2150.3C at 9-4 through 9-5 (Figs. 9-1 and 9-2)).
[94] *See* Ex. C-17 at 3 (FAA Order No. 2150.3C at 9-3, Chap. 9, ¶ 6(b)(2) (stating "[c]ounsel begins with a sanction at the midpoint of the applicable range...")).
[95] Complainant's counsel argued that no mitigating factors existed in this case while two aggravating factors existed, the degree of hazard and the diversion of a flight with over 100 passengers. *See* Hearing Transcript at 216-218.

An appropriate civil penalty must reflect the totality of the circumstances surrounding the violation, while providing enough substance to serve as a deterrent to both the current violator and the industry as a whole in order to promote the goal of safety.[84]  Section g of Paragraph 6 of Chapter 9 of FAA Order No. 2150.3C provides a non-exhaustive list of mitigating or aggravating factors and elements that may be considered:

> 1. degree of hazard; 2. Violation history; 3. Level of certificate and experience; 4. Compliance disposition of violator; 5. Systematic/isolated violations; 6. Corrective action; 7. Inadvertence; 8. Voluntary reporting of violations; and 9. Criminal conviction.[85]

While the undersigned judge is not expressly required to follow the provisions of FAA Order No. 2150.3C,[86] it does provide guidance.[87]  Further, the Administrator has stated that "similar criteria should be considered in assessing civil penalties in non-hazardous materials types of cases"[88] to the following statutorily required factors in considering a civil penalty involving hazardous materials violations:

> (1) the nature, circumstances, extent, and gravity of the violation; (2) with respect to the violator, the degree of culpability, any history of prior violations, the ability to pay, and any effect on the ability to continue to do business; and (3) other matters as justice may require.[89]

The undersigned judge considered all of the pertinent factors to assess a civil penalty that will deter future violations by the Respondent and members of the flying public.  In considering the relevant factors, it is important to note that the Respondent did not provide evidence of financial hardship regarding his ability to pay a sanction.

In closing argument, Complainant's counsel explained that, in determining the proposed civil penalty, the Complainant deemed the applicable section of FAA Order No. 2150.3C to be "[i]nterference with crewmember," a severity level 2 violation.[90]  Complainant's counsel further argued that the Respondent's actions in this case were reckless or intentional.[91]  In support of this argument, Complainant's counsel contended that the Respondent "admitted to being upset

---

[84] *See In re Toyota Motor Sales, USA, Inc.*, FAA Order No. 1994-28 at 11 (Order and Decision, Sept. 30, 1994); *In re Charter Airlines, Inc.*, FAA Order No. 1995-8 at 28 (Decision and Order, May 9, 1995).
[85] *See* Ex. C-17 at 7-9 (FAA Order No. 2150.3C at 9-7 through 9-9).
[86] *See Folsom's Air Service, Inc.*, FAA Order No. 2008-11 at 14 (Decision and Order, November 6, 2008)  (finding that because administrative law judges are not agency personnel, they are not expressly required to follow the guidance provided in FAA Order No. 2150.3A.).
[87] *See In re Air Carrier*, FAA Order No. 1996-19 at 7 (Decision and Order, June 4, 1996) (*citing Northwest Airlines, Inc.*, FAA Order No. 1990-37 at 8).
[88] *In re Luxemburg*, FAA Order No. 1994-18 at 6 (Order and Decision, June 22, 1994) (*citing Northwest Airlines, Inc.*, FAA Order No. 1990-37 at 12 n. 9).
[89] 49 U.S.C. § 46301(e).  *See also* 14 C.F.R. § 13.16(c).
[90] *See* Hearing Transcript at 214 and Ex. C-17 at 30 (FAA Order No. 2150.3C at 9-30 (Fig. 9-9-i(2))).
[91] *See* Hearing Transcript at 214.

# Detail Note

## Event ID: 220601052

## Debrief

**Created:** 6/4/2022 08:10     Celi, Rosa                **Updated:** 6/4/2022 08:10     Celi, Rosa

Pax enraged when denied use of bc bathroom, that was busy and MC
bathroom empty. Carts were not in MC aisle. He is not an old
person , not special needs. Stated he was treated disrespectfully
because he was a D3. At that time we did not know he was a D3. He
went to the back and started to yield F/ As  in a threatening way.
He returned to his seat and asked for a Rum and coke. As he
appeared to be intoxicated . The drink was denied. He went to the
back and started screaming  again. At that time the captain was
advised an communicate with the F/As in MC and as he was in the
inter phone he could hear the pax screaming. By directions of the
captain I gave him a notice on disruptive behavior. But he started
shouting and showing his AA card and still complaining that was
treated disrespectfully because "did not pay his ticket".
Pax were terrified, I had to move pax seated on seats 17AB who
were next to him.

## Crew List  and Contact

| BASE | SEAT | NAME | EMP # | PHONE |
|------|------|------|-------|-------|
| MIA | CA | JAFFE BL | | |
| MIA | FO | OCASIO JH | | |
| LIM | 01 | CELI R | | |
| LIM | 02 | SANCHEZ AM | | |
| LIM | 04 | QU;IROZ M | | |

## Suspect:

JOHN NUNEZ
14475 SW 23RD TERRANCE
MIAMI, FL 33175

JOHNNUNEZ@GMAIL.COM

## Aircraft Information:



| Flight Number : | 1124 | Actual Departure Airport : BAQ |
| Scheduled Flight Departure Date / City : | Jun 3, 2022 / BAQ | Actual Departure Time :   16:02 |

Aircraft Equipment Type : 67  N717
Flight Required Language : SPANISH

| | | SCHEDULED | ACTUAL | GATE |
|---|---|---|---|---|
| DEPARTURE : BAQ | OUT | 14 30 ( Jun 3, 2022 ) | 16 02 ( Jun 3, 2022 ) | 5 |
| ARRIVAL :  BAQ | IN | 14 30 ( Jun 3, 2022 ) | 17 44 ( Jun 3, 2022 ) | D27 |



| Company: | AA-American Airlines | Altitude (in 00's): | |
| Flight Number: | 1124 | | |
| Flight Date/Time: | 06/03/2022   00:00 | Fuel Dumped (Gal): | |
| Departure Station: | BAQ | Nose Number: | 717 |
| Arrival Station: | MIA | FAA Reg Number: | N717UW |
| Interrupt Station: | | Aircraft Type: | A319-112 |
| Phase Of Flight: | Departure | Fleet: | A319 |
| Departure Terminal: | | Arrival Terminal: | |
| Departure Gate: | 5 | Arrival Gate: | D27 |

Passengers Not On Board (XON)



AA  1124  03Jun  BAQ   1840  319  XON LIST

| Last Name | First Name | FFER | Group Code | Class | Destination Airport | Seat | Pax Type | Bags | | | | | | | | | | Edits [?] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | A12 | B | MIA | | F | | NB | BESH | CM | DOCV | OK | SC | SP | | | | | | | | |
| | | | | V | MIA | | F | | NB | CLUB | PL | | | | | | | | | | | | |
| | | | A12 | B | MIA | | F | | NB | BESH | CM | DOCV | HCL& | SC | | | | | | | | | |
| NUNEZ | JOHN | QTMDCV | | Y | MIA | | E | | NB | ADM | CLUB | CM | DOCV | ET | OK | PCC | PRO | PTEM | PTPH | SC | | | |

07/08/2022

# Detail Note

Page 7 of 10

## Event ID: 220601052

## Passenger List (G*L../ON)

Created: 6/3/2022 20:46     De La Hoz, Nick          Updated: 6/3/2022 20:46     De La Hoz, Nick

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 110 | | | | | | | | PTEM DOCV BESH OK CM |
| | ON- 03JUN2022 | 1534 | | | | | | |
| 61 032 | ▮▮▮ ▮▮▮ ▮▮▮ | AL4 | Q | MIA 18A-F | 1 | SC ET LF PTPH PTEM DOCV HCLR CM |
| | ON- 03JUN2022 | 1532 | | | | | | |
| 62 031 | ▮▮▮▮ ▮▮▮ | AL4 | Q | MIA 18B-F | 1 | SC ET LF PTPH PTEM DOCV HCLR CM |
| | ON- 03JUN2022 | 1532 | | | | | | |
| 63 029 | ▮▮ ▮ ▮▮ | AL4 | Q | MIA 18C-F | 1 | SC ET LF PTPH PTEM DOCV HCLR CM |
| | ON- 03JUN2022 | 1530 | | | | | | |
| 64 030 | ▮▮▮ ▮▮ | AL4 | Q | MIA 18D-F | 1 | SC ET LF PTPH PTEM DOCV HCLR CM |
| | ON- 03JUN2022 | 1530 | | | | | | |
| 65 019 | ▮▮▮ ▮▮ | | V | MIA 18F-F | NB | SC ET LF RCK ADOC PTPH PTEM DOCV HCLR OK CM |
| | ON- 03JUN2022 | 1531 | | | | | | |
| 66 102 | ▮▮▮ ▮▮ | | B | MIA 19A-F | 1 | SC ET LF ADOC OB PTPH PTEM DOCV BESH HCLR CM |
| | ON- 03JUN2022 | 1534 | | | | | | |
| 67 101 | ▮▮▮ ▮▮ | | B | MIA 19C-F | 2 | SC ET LF OB DOCV BESH PRCH CM |
| | ON- 03JUN2022 | 1533 | | | | | | |
| 68 065 | ▮▮▮ ▮▮ | BC3 | B | MIA 19D-F | NB | SC ET LF PTPH PTEM DOCV BESH OK CM |
| | ON- 03JUN2022 | 1531 | | | | | | |
| 69 063 | ▮▮▮ ▮▮ | BC3 | B | MIA 19E-F | NB | SC ET LF PTPH PTEM DOCV BESH OK CM |
| | ON- 03JUN2022 | 1530 | | | | | | |
| 70 064 | ▮▮▮ ▮▮ | BC3 | B | MIA 19F-F | NB | SC ET LF PTPH PTEM DOCV BESH OK CM |
| | ON- 03JUN2022 | 1530 | | | | | | |
| 71 089 | ▮▮▮ ▮▮ | | N | MIA 20A-F | 2 | SC ET LF OB PTPH PTEM DOCV OK CM |
| | ON- 03JUN2022 | 1535 | | | | | | |
| 72 059 | ▮▮▮ ▮▮ | AO2 | Q | MIA 20B-F | 1 | SC ET LF OB PTPH PTEM DOCV PCC GRPO AD CCM OK CM WCHR |
| | ON- 03JUN2022 | 1532 | | | | | | |
| 73 058 | ▮▮▮ ▮▮ | AO2 | Q | MIA 20C-F | 1 | SC ET LF OB PTPH PTEM DOCV GRPO AD OK CM WCHR |
| | ON- 03JUN2022 | 1533 | | | | | | |
| 74 004 | ▮▮▮ ▮▮ | | N | MIA 20D-F | 1 | SC ET LF RCK ADOC OB PTPH PTEM DOCV HCLR OK CM |
| | ON- 03JUN2022 | 1531 | | | | | | |
| 75 074 | ▮▮ | AU2 | V | MIA 20E-F | 1 | SC ET LF PTPH PTEM DOCV OK CM |
| | ON- 03JUN2022 | 1534 | | | | | | |
| 76 075 | ▮▮ | AU2 | V | MIA 20F-F | NB | SC ET LF PTPH PTEM DOCV OK CM |
| | ON- 03JUN2022 | 1534 | | | | | | |
| 77 079 | ▮▮ ▮▮ | AT2 | S | MIA 21A-F | 2 | SC ET LF ADOC OB PTPH PTEM DOCV HCLR CM |
| | ON- 03JUN2022 | 1534 | | | | | | |
| 78 078 | ▮▮ ▮▮ | AT2 | S | MIA 21B-F | 2 | SC ET LF ADOC OB PTPH PTEM DOCV |

# Detail Note

## Event ID: 220601052



```
                                        HCLR CM
           ON- 03JUN2022  1534
79   ███████  ██████        N    MIA 21C-F  1 SC ET LF PTPH
095                                           PTEM DOCV CM
           ON- 03JUN2022  1530
80   ███████  █████  AN2  N    MIA 21D-F  1 SC ET LF OB
105                                           PTPH PTEM DOCV NOEX
                                              CM
           ON- 03JUN2022  1534
81   ███████  █████  AN2  N    MIA 21E-F  1 SC ET LF OB
```

you review my travel history and ask yourselves an honest question, why would I do this? Your employees are not infallible and not perfect. They have a tough job as it is, but believe me, I Had to get to miami that day and so did everyone else on that flight, but how can I prove my innocence when it's my word against two clearly overzealous employees, it's my word against theirs. I wasn't arrested, sanctioned fined or prosecuted, I feel I was unjustly accused only because I chose to stand up for myself and I couldn't tolerate the disrespect after a 3rd time,

I tried to explain my situation but since I was a d3 employee, I was treated like persona non-grata. I had no issues with immigration and customs, those are all bold face lies. The video clearly shows that I'm laughing from the absurdity and ridiculousness of it all. I don't understand why the plane was returned to Colombia, all I said was that I would have been treated differently had I been on a revenue passenger! And I can't remember which one of the two who struck me on the nose, but neither of them had the right to put their hands on me, there was video footage of it all, I did not pose any threat and I would have never done that. I'm a 48 year old investment banker, with two businesses and a family. I have no criminal record besides a traffic infraction in my youth but you can you review my flight history, I have logged many miles without incident and to be accused of threatening or menacing anyone is simply ridiculous.

If you need any information from the national police they captain on charge at the airport is willing to go on the record and corroborate his findings, that this was a simple misunderstanding over a soft drink and tempers flared. On my honor, I tried to defuse the situation but they are not being truthful in their accusations and If I had done that, legally this would be clearly be a different matter. In situations like this people do not have a moral compass and they were drunk with power and overstepped their boundaries. I only ask to that you ask this one question….Why did this happen?

PLEASE CONFIRM RECIEPT OF THIS COMMUNICATION,

**EXHIBIT E**

# American Airlines Conditions of Carriage – 2022 & 2024 Excerpts

(Pages 5–9 from 2022 CoC)

Includes passenger responsibilities and accommodations for customers with medical needs. Nowhere prohibits lavatory use by cabin class or supports the fabricated "federal law."

Case 1:25-cv-21630-RKA Document 1 Entered on FLSD Docket 04/09/2025 Page 53 of 85

 American Airlines

Mobile  Home  Search AA.com® 

PLAN TRAVEL  TRAVEL INFORMATION  AADVANTAGE®

 LOG

⌂ Home  ›  Legal, privacy & copyright  ›  Conditions of carriage

# Conditions of carriage

Updated February 22, 2022

# The contract between you, the passenger, and us, American Airlines

At American Airlines, we fly over borders – across the country and the world – to connect people and communities. Providing this service and making the world a smaller, more inclusive place, is a huge part of who we are.

Flying with American »

All transportation of passengers and bags provided by American Airlines is subject to the terms of these Conditions of Carriage, in addition to any:

- Terms printed on any ticket, ticket jacket or ticket receipt
- Published fare rules; and
- Applicable tariffs filed by American Airlines in accordance with U.S. Department of Transportation regulations.

All terms, fare rules, and tariffs are incorporated herein by reference and constitute part of your agreement with American Airlines.

American Airlines General Rules of the International Tariff ⧉

## You

Passenger responsibilities »

Children traveling »

Customers with special needs »

## Your flight

Check-in and arrival »

Changes to schedules / operations »

Events beyond our control »

Oversold flights »

Delays, cancellations and

## Your ticket, bags & refunds

Baggage »

Baggage liability (domestic flights) »

Liability for international flights »

Ticket types and refunds »

Ticket validity »

Case 1:25-cv-21630-RKA   Document 1   Entered on FLSD Docket 04/09/2025   Page 54 of 85

- Jetstar
- Jetstar Japan
- Qantas
- Qatar Airways
- Royal Air Maroc
- Royal Jordanian Airlines
- Silver Airways
- Vueling

| What we say | What it means |
| --- | --- |
| American Ticket Office | A ticket sales office of American Airlines, Inc. / American Eagle or one of our appointed travel agents |
| Assistive device | Equipment used by passengers with special needs (Disabled Passenger or Qualified Individual with a Disability) to hear, see, communicate, maneuver or perform daily functions; includes medical devices and medications |
| Baggage | Personal property that's either checked in or carried on the plane |
| Codeshare | Codeshare agreements allow us to sell seats on flights operated by other airlines, giving American customers access to more flights and destinations; partners include British Airways, Iberia, Alaska Airlines and more |
| Customs and Border Protection (CBP) | CBP is our country's primary border control organization. It regulates and facilitates international trade, collects import duties, and enforces U.S. regulations, including trade, customs and immigration |
| Disabled Passenger or Qualified Individual with a Disability | An individual who has a physical or mental impairment that, permanently or temporarily, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment as further defined in the U.S. Department of Transportation regulations in 14 C.F.R. Section 382.3 |
| Domestic | The 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands, also see 'U.S.' |

| | |
|---|---|
| Federal Aviation Administration (FAA) | An agency of the U.S. Department of Transportation that regulates all aspects of civil aviation in the U.S. including operation of airports, air traffic and the certifying personnel and aircraft |
| Fare | The price you pay for your ticket; also, the rules associated with that ticket including whether it's refundable |
| Flight segment | A flight segment is a nonstop point-to-point flight that consists of one takeoff and one touchdown |
| International | Outside the 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands; also, outside of your home country |
| Montreal Convention and Warsaw Convention | International agreements that set the rules for airlines' liability when we carry passengers, baggage and goods internationally |
| Oversold flight | When the number of checked-in passengers exceeds the number of seats |
| Stopover | A planned stop in a city/airport for over 4 hours |
| Ticket | Passenger ticket, bag check and boarding pass which incorporate these conditions of carriage, including tickets issued electronically |
| Transportation Security Administration (TSA) | An agency of the U.S. Department of Homeland Security with authority over the security of the traveling public in the U.S. |
| U.S. | The 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands |
| U.S. Department of Transportation (DOT) | A federal Cabinet department of the U.S. government that regulates aspects of air transportation |

# You

As a passenger, you're required to act in way that's consistent with ensuring the safety of everyone on board. This includes complying with the laws and travel requirements of the countries we fly to, from or over. Traveling can be stressful, and we appreciate your patience and courtesy for other passengers and American Airlines team

Case 1:25-cv-20630-RKA   Document 1   Entered on FLSD Docket 04/09/2025   Page 56 of 85

members.

⌃ Passenger responsibilities

## Complying with the law and government regulations

To fly on American, you must:

- Have a valid photo ID accepted by the TSA (like a driver's license or other government issued ID).
- Have a valid passport, visa and any travel documents required if you're traveling internationally.
- Allow your baggage to be inspected by Customs, the TSA or other government officials.

Be sure your driver's license complies with REAL ID and that your passport is valid or you may not be allowed to board your flight. Some countries require your passport be valid for 3 – 6 months beyond your departure date, so be sure you know the rules before you travel.

We are not responsible for any loss, damage or expense if you do not meet the travel document requirements.

More about ID requirements »

## Complying with airline rules for safety

The safety and comfort of our customers and team members is our top priority. We will respond seriously to any language or behavior that threatens the well-being or functionality of our crew or any American Airlines team member. Violent or inappropriate actions may result in the denial of boarding, removal from the terminal or legal prosecution.

To ensure a safe environment for everyone, you must:

- Allow you and your bags to be searched for explosives, dangerous weapons or banned substances.
- Show a valid ID.
- Understand and comply with all safety instructions.
- Release us from responsibility for any loss, damage or expense if you do not meet the travel document requirements.
- Behave appropriately and respectfully with other passengers, crew or any American Airlines team member.
- Postpone your flight if you have a dangerous disease deemed transmissible by a federal public health authority.
- Be respectful that your odor isn't offensive (unless it's caused by a disability or illness).
- Dress appropriately; bare feet or offensive clothing aren't allowed.
- Not threaten the safety of the flight in any way.
- Have the right travel documents and be allowed to travel to, from or through any countries in your itinerary.

- Be able to sit with your seatbelt fastened.

If your physical or mental condition is such that in American's sole opinion, you are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an attendant, American may refuse to transport you.

In addition, you may be asked to give up your seat if a government official needs space, for weather conditions requiring reduced aircraft load, or for other conditions beyond our control.

## Failing to comply

We may not let you fly (temporarily or permanently) for any reason, including if you:

- Don't obey the law
- Are uncooperative, abusive, harassing, or show the potential to be while on board
- Pose a risk to safety or security
- Appear intoxicated or under the influence of drugs
- Attempt to interfere with the flight crew or refuse to obey instructions
- Fail to comply with American Airlines rules or policies
- Need to be removed for your safety or the safety of other passengers or the crew
- Have a communicable disease or virus, or if we suspect you have a communicable disease or virus
- Are traveling with an animal that causes a delay or damage to the plane or other passengers

You may also be liable for any loss, damage or expense resulting from your conduct. For example, you may be liable for the costs if we have to divert to another city because of your conduct. Also, under U.S. law you may be liable if you assault a federal, airport or airline employee with security duties. Failing to meet passenger responsibilities is a material breach of this contract.

## ⌄ Children traveling

We welcome children of all ages on board. Be sure you know the rules for your child based on his or her age. We count "age" based on the child's age the day of departure.

Traveling with children and infants »

### Infants (under 2 years)

- One infant under 2 can travel in your lap. You are not required to pay for a separate seat unless you have an FAA approved car seat you plan to use on board.
- There may be a fee for infants traveling outside the U.S.
- Infants as young as 2 days old can fly, but any infant under 7 days old needs a passenger medical form filled out by your doctor before flying.

Case 1:25-cv-21630-RKA   Document 1   Entered on FLSD Docket 04/09/2025   Page 58 of 85

■ Infants must be accompanied by a parent (any age) or someone 16 years or older in the same cabin.

## Children (2 years or older)

■ Children 2 and older must have a purchased seat. If your child turns 2 during a trip, the child will need their own seat for the remainder of the trip.

■ Children under 5 years cannot travel alone.

Traveling with children and infants »

## Unaccompanied minor service

Our unaccompanied minor service ensures your child is escorted on the plane, introduced to the flight attendant, chaperoned during connections and brought to the person you designate when they arrive. Keep in mind, flight attendants can't continuously monitor children during flight.

Unaccompanied minor service »

## Customers with special needs

We're dedicated to providing customers with special needs dignified, professional and courteous service at all times. Customers with special needs may need to board the plane early.

You can request special assistance when you book on aa.com (our site is accessible) or call us anytime at (800) 433-7300.

## Special assistance coordinators

When you request special assistance, a coordinator will contact you before your flight to make sure necessary medical paperwork is complete and requests are arranged.

They can help with:

■ Wheelchair assistance

■ Mobility assistance, getting in and out of the plane

■ Traveling with a service animal*

■ Traveling with a portable oxygen concentrator (POCs)*

■ Battery-powered medical devices

■ Traveling within 7 days of your due date or after your delivery

■ Adjacent seating for yourself and your personal care attendant

■ Disassembly and packaging for mobility assistive devices when needed

*We require at least 48 hours advance notice if you need to travel with a service animal, or a POC.

Call us anytime:

- 800-433-7300
- For hearing or speech impaired assistance dial 711 to be connected through the National Relay Service

Special assistance »

# Mobility and medical devices

If you're traveling with any medical device, a wheelchair or other mobility device, we're here to help. If we're able, we offer early boarding, help getting off the plane and airport assistance. Contact us to make sure your device is approved for travel and to make any special requests.

Mobility and medical devices »

# Special assistance issues

If you had a special-assistance issue on your trip, please go to the American Airlines customer service desk. We have local complaint resolution officials (LCRO) available during operating hours, and a corporate complaint resolution official is available to assist our LCROs 24/7. You can also call our disability team 24/7 at 800-892-3624.

# Your flight

When it comes to checking in and arriving at the airport, earlier is better. Give yourself extra time if you're checking bags or traveling internationally.

Before you head to the airport, you can check for travel alerts that impact the cities in your trip and get flight status information like gates and times.

Travel alerts »

Get flight status information »

Download the American Airlines app to get real time updates about your travel.

American Airlines app »

⊗ Check-in and arrival

## Check-in times

You can check in on aa.com and in the app beginning 24 hours before departure. All airports have minimum

- We (or our partners) cancel a flight or route
- Your checked baggage is late (except as required by statute, regulation, or Convention)
- There are special, incidental or consequential damages because of these changes

If we or our airline partner fails to operate or delays your arrival more than 4 hours, our sole obligation is to refund the remaining ticket value and any optional fees according to our involuntary refunds policy, subject to our policy for rebooking your delayed / canceled flight.

Refunds »

Rules for delays on international trips are governed by the Montreal Convention and Warsaw Convention. The full linked page provides more information and is incorporated by reference.

Montreal Convention and Warsaw Convention »

## Events beyond our control (Force Majeure)

When there's an event we can't control like weather, a strike or other civil disorder, we may have to cancel, divert or delay flights. If your ticket still has value (if you were, for example, re-accommodated in a different class of service) we'll refund the unused portion to the original form of payment, but beyond that we are not liable.

Such "Force Majeure" events include:

- Meteorological or weather conditions
- Civil disturbances including war, embargoes or unsettled international conditions (real or threatened)
- Acts of terror
- Public health emergencies of domestic or international concern
- Labor disputes that involve or affect our service
- Government regulations or requirements
- Shortage of labor, fuel or facilities of American or others
- Any fact not reasonably foreseen or predicted by American

International air transportation liability is regulated by the Montreal Convention and Warsaw Convention.

Montreal Convention and Warsaw Conventions »

## Oversold flights

A flight is "oversold" when there are more checked-in passengers than seats. When this happens, our team gets involved as early as possible to find volunteers to change flights.

When, despite our best efforts, we don't have enough volunteers, we'll have to choose customers to change

Each passenger must have a valid ticket to fly. A ticket is non-transferrable – it can't be used by or refunded to any other passenger. All refunds are made to the original form of payment.

## How long a ticket is valid

In general, a ticket is valid for 1 year:

- If unused, you must start travel within 1 year of date the ticket was issued
- If partially used, you must complete travel within 1 year of the first completed flight

So for an unused ticket issued June 1, 2019, you must begin travel on the new ticket by June 1, 2020.

For a roundtrip ticket that was partially flown on March 1, 2019, you must complete all new travel by March 1, 2020.

These rules apply unless your ticket states otherwise.

## Refunds

Generally, you have up to 24 hours from when you buy your ticket to get a full refund if you booked at least 48 hours before departure. You must cancel your trip within 24 hours of purchase for a refund. If you bought your ticket through a travel agency or another booking source, contact them for a refund. Some countries have different rules about refunds, and if so, we will follow those rules.

Refunds will be made only to the person who paid. Tickets issued for official government travel will be refunded only to the government agency that issued the transportation request.

## Refundable tickets

If you bought a refundable ticket, decide not to travel and want a refund, we'll pay:

- The full amount of the ticket if travel hasn't started
- The value of the unused travel if the ticket is partially used

We'll refund the original credit card within 7 days (allow 1-2 billing cycles for credit to show). We'll process cash and check refunds within 20 days of receiving all your paperwork.

Some requests may take longer, for example, tickets bought outside the U.S. in another currency or tickets that require research or verification. We are not liable for longer processing times.

Refunds FAQs »

## Non-refundable tickets

We don't refund cash for non-refundable tickets. But if you cancel your trip before departure, we will then cancel the ticket and issue a credit you can use toward future travel on American. You'll need to book a new trip with your credit within 1 year (a change fee and any difference in ticket price may apply).

12/13/24, 12:46 PM
Conditions of carriage – Support – American Airlines
Case 1:25-cv-21630-RKA    Document 1    Entered on FLSD Docket 04/09/2025    Page 62 of 85

  English ▾    Search AA.com® 🔍

 American     **Plan travel**  **Travel informatio**  **AAdvantage®**    **Log in**

⌂ Home  ›  Legal, privacy & copyright  ›  Conditions of carriage

# Conditions of carriage

Updated October 28, 2024

# The contract between you, the passenger, and us, American Airlines

At American Airlines, we fly over borders – across the country and the world – to connect people and communities. Providing this service and making the world a smaller, more inclusive place, is a huge part of who we are.

Flying with American »

All transportation of passengers and bags provided by American Airlines is subject to the terms of these Conditions of Carriage, in addition to any:

- Terms printed on any ticket, ticket jacket or ticket receipt
- Published fare rules; and
- Applicable tariffs filed by American Airlines in accordance with U.S. Department of Transportation regulations.

All terms, fare rules, and tariffs are incorporated herein by reference and constitute part of your agreement with American Airlines.

American Airlines General Rules of the International Tariff ⬀

## You

Passenger responsibilities »

Children traveling »

Customers with special needs »

## Your flight

Check-in and arrival »

Changes to schedules / operations »

Events beyond our control »

Oversold flights »

Delays, cancellations and diversions »

## Your ticket, bags & refunds

Baggage »

Baggage liability (domestic flights) »

Liability for international flights »

Ticket types and refunds »

Ticket validity »

## Contact us

Good or bad, we want to hear from you. Please contact us with your comments, concerns and feedback. Our Customer Relations team is here for you and will respond promptly.

Email Customer Relations »

⊙ Contract details

⊙ The words we use

# You

As a passenger, you're required to act in way that's consistent with ensuring the safety of everyone on board. This includes complying with the laws and travel requirements of the countries we fly to, from or over. Traveling can be stressful, and we appreciate your patience and courtesy for other passengers and American Airlines team members.

⊙ Passenger responsibilities

⊙ Children traveling

⊙ Customers with special needs

# Your flight

When it comes to checking in and arriving at the airport, earlier is better. Give yourself extra time if you're checking bags or traveling internationally.

Before you head to the airport, you can check for travel alerts that impact the cities in your trip and get flight status information like gates and times.

Travel alerts »

Get flight status information »

Download the American Airlines app to get real time updates about your travel.

American Airlines app »

⊙ Check-in and arrival

 English ▾     Search AA.com® 🔍

 American      Plan travel     Travel informatio     AAdvantage®          Log in

🏠 Home  ›  Legal, privacy & copyright  ›  Conditions of Carriage

# Conditions of Carriage

Updated April 4, 2025

## The contract between you, the passenger, and us, American Airlines

At American Airlines, we fly over borders – across the country and the world – to connect people and communities. Providing this service and making the world a smaller, more inclusive place, is a huge part of who we are.

Flying with American »

All transportation of passengers and bags provided by American Airlines is subject to the terms of these Conditions of Carriage, in addition to any:

- Terms printed on any ticket, ticket jacket or ticket receipt
- Published fare rules; and
- Applicable tariffs filed by American Airlines in accordance with U.S. Department of Transportation regulations.

All terms, fare rules, and tariffs are incorporated herein by reference and constitute part of your agreement with American Airlines.

American Airlines General Rules of the International Tariff 🗗

### You

Passenger responsibilities »

Children traveling »

Customers with special needs »

### Your flight

Check-in and arrival »

Changes to schedules / operations »

Events beyond our control »

Oversold flights »

Delays, cancellations and diversions »

### Your ticket, bags & refunds

Baggage »

Baggage liability (domestic flights) »

Liability for international flights »

Ticket types and refunds »

Ticket validity »

## Contact us

Good or bad, we want to hear from you. Please contact us with your comments, concerns and feedback. Our Customer Relations team is here for you and will respond promptly.

Email Customer Relations »

## ⊙ Contract details

When you buy a ticket or travel on a flight provided by American Airlines, you agree:

- To the extent not preempted by federal law, Texas law applies to this contract and any dispute from your ticket purchase or travel on American Airlines without regard to conflict of law principles.

- This contract cannot be modified or waived unless authorized in writing by an American Airlines corporate officer.

- Even if you didn't pay for your ticket, for example if you're one of multiple passengers in the same reservation, this contract is an agreement between us and you.

- We provided links to pages on our site for more information, but those pages are not part of this contract.

- Though we translated these conditions of carriage for convenience, the English language version is the official, legal version.

- This contract is the entire agreement that governs your rights and responsibilities as a passenger. If we don't enforce a right under this contract in one case, it does not waive our right to enforce the contract later. And if any part of this contract is found invalid or unenforceable, we'll strike what's invalid or unenforceable without effect to the rest of the contract.

- **Limit of liability:** You agree we are not liable for special, consequential, indirect or incidental damages that arise from this agreement, even if we knew, should've known or were advised damages were possible, including from lost, damaged or delayed bags (including lost revenue or business interruption).

- **Class Action Waiver:** You agree that any lawsuit you bring against us, or any of our affiliated entities, agents, directors, employees, and/or officers related to these Conditions of Carriage, your ticket, and/or your use of or dealings with American's website, customer service and other call centers, or American will be brought only in your individual capacity, and may not be brought in or asserted as part of a class action proceeding.

Customer service plan »

## ⊙ The words we use

# You

As a passenger, you're required to act in way that's consistent with ensuring the safety of everyone on board. This includes complying with the laws and travel requirements of the countries we fly to, from or over. Traveling can be stressful, and we appreciate your patience and courtesy for other passengers and American Airlines team members.

## ⊙ Passenger responsibilities

## Complying with the law and government regulations

To fly on American, you must:

- Have a valid photo ID accepted by the TSA (like a driver's license or other government issued ID).

- Have a valid passport, visa and any travel documents required if you're traveling internationally.

- Allow your baggage to be inspected by Customs, the TSA or other government officials.

Be sure your driver's license complies with REAL ID and that your passport is valid or you may not be allowed to board your flight. Some countries require your passport be valid for 3 – 6 months beyond your departure date, so be sure you know the rules before you travel.

We are not responsible for any loss, damage or expense if you do not meet the travel document requirements.

More about ID requirements »

## Complying with airline rules for safety

The safety and comfort of our customers and team members is our top priority. We will respond seriously to any language or behavior that threatens the well-being or functionality of our crew or any American Airlines team member. Violent or inappropriate actions may result in the denial of boarding, removal from the terminal or legal prosecution.

To ensure a safe environment for everyone, you must:

- Allow you and your bags to be searched for explosives, dangerous weapons or banned substances.

- Show a valid ID.

- Understand and comply with all safety instructions.

- Release us from responsibility for any loss, damage or expense if you do not meet the travel document requirements.

- Behave appropriately and respectfully with other passengers, crew or any American Airlines team member.

- Postpone your flight if you have a dangerous disease deemed transmissible by a federal public health authority.

- Be respectful that your odor isn't offensive (unless it's caused by a disability or illness).

- Dress appropriately; bare feet or offensive clothing aren't allowed.

- Not threaten the safety of the flight in any way.

- Have the right travel documents and be allowed to travel to, from or through any countries in your itinerary.

- Be able to sit with your seatbelt fastened.

If your physical or mental condition is such that in American's sole opinion, you are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an attendant, American may refuse to transport you.

In addition, you may be asked to give up your seat if a government official needs space, for weather conditions requiring reduced aircraft load, or for other conditions beyond our control.

## Failing to comply

We may not let you fly (temporarily or permanently) for any reason, including if you:

- Don't obey the law

- Are uncooperative, abusive, harassing, or show the potential to be while on board

- Pose a risk to safety or security

- Appear intoxicated or under the influence of drugs

- Attempt to interfere with the flight crew or refuse to obey instructions

- Fail to comply with American Airlines rules or policies

- Need to be removed for your safety or the safety of other passengers or the crew

- Have a communicable disease or virus, or if we suspect you have a communicable disease or virus

- Are traveling with an animal that causes a delay or damage to the plane or other passengers

You may also be liable for any loss, damage or expense resulting from your conduct. For example, you may be liable for the costs if we have to divert to another city because of your conduct. Also, under U.S. law you may be liable if you assault a federal, airport or airline employee with security duties. Failing to meet passenger responsibilities is a material breach of this contract.

⌄ Children traveling

⌄ Customers with special needs

# Your flight

When it comes to checking in and arriving at the airport, earlier is better. Give yourself extra time if you're checking bags or traveling internationally.

Before you head to the airport, you can check for travel alerts that impact the cities in your trip and get flight status information like gates and times.

Travel alerts »

Get flight status information »

Download the American Airlines app to get real time updates about your travel.

American Airlines app »

⌄ Check-in and arrival

⌄ Our responsibilities when there are schedule / operations changes

⌄ Events beyond our control (Force Majeure)

⌄ Oversold flights

Conditions of carriage – Support – American Airlines

⌄ Delays, cancellations and diversions

# Your ticket, bags and refunds

⌄ Baggage

⌄ Baggage liability (domestic flights)

⌄ Liability for international flights

⌄ Ticket types and refunds

⌄ Ticket validity

# You may also like...

Tarmac delay contingency plan »

Customer service plan »

Contact American »

Baggage »

⬆ Back to top

| Help | About American | Extras |
|------|----------------|--------|
| Contact American | About us | Business programs |
| Receipts and refunds | We're hiring! Join our team ⧉ | Gift cards ⧉ |
| FAQs | | Trip insurance |

Agency reference

American Airlines Cargo

Bag and optional fees

Tarmac delay
contingency plan

Customer service plan

Conditions of carriage

Investor relations

Newsroom

Legal, privacy, copyright

Environmental, social
and governance

Modern Slavery Report

Browser compatibility

Web accessibility



**Special offer: Earn 75,000 bonus miles.**
**Terms apply.**

**Buy**Miles
**Buy or gift miles for**
**new adventures**

AVIS  Budget
**Drive off with up to**
**1,000 bonus miles**

Link opens in new window.
Site may not meet accessibility
guidelines. AA.com®

  

**EXHIBIT F**

# American Airlines Customer Service Plan – Special Needs & Dignity Policy

Extract from AA's public Customer Service Plan describing its duty to treat passengers—especially those with medical conditions—with dignity, professionalism, and assistance.

- Service with domestic codeshare partners
- Ticket refunds
- Other travel policies

## ⌃ Accommodation of customers with special needs

## Unaccompanied minor service

American Airlines and American Eagle's unaccompanied minor service allows children in certain circumstances to travel alone on our flights.

Guidelines for our unaccompanied minor service:

- Children 5 years and older may travel on American Airlines or American Eagle on non-stop or same-plane flights.
- Children must be 8-14 years old to travel itineraries requiring a connection on American Airlines or American Eagle, connecting flights must be through the following airports: CLT, DCA, DFW, JFK, LAX, LGA, MIA, ORD, PHL, PHX.
- Children 15-17 years old are considered young adults and are not required to use the unaccompanied minor service. However, the unaccompanied minor service is available to them upon request and under the same provisions.
- American Airlines and American Eagle do not accept unaccompanied children (UMNR) when their itinerary includes a connection to/from another airline, including codeshare and **one**world® partners.
- A charge is assessed for providing unaccompanied minor service.

When taking your child's reservation, we will request telephone numbers for parents or guardians. At check-in, you will also be asked to provide names, addresses, and home and business phone numbers for you and the party meeting your child. This information is used in identifying the party meeting your child upon arrival, and it will assist us in contacting you if necessary. We recommend checking in early at the airport to ensure that you have adequate time to complete the required paperwork and pre-board your child.

The welfare of unaccompanied minors is a matter we take very seriously. In advance or upon check-in, if there is a possibility that your child's flight might be delayed or misconnect for any reason, we may change your child's flight schedule, including the departure date.

An airport representative will assist your child at the connecting city, escort your child to his or her next flight, and deliver your child to the person meeting him or her at the destination airport. We do not accept reservations for an unaccompanied child if it would mean his or her connecting flight would be the last flight of the day.

Additional details on our unaccompanied minor service are available from Reservations.

Helpful suggestions:

- You should stay with your child until he or she boards the aircraft and remain at the airport until the flight leaves the gate
- Provide your child with an extra copy of his or her contact phone numbers
- Before going to the airport, explain what will happen during the child's trip and let them know what to expect; this may include teaching him or her about airplanes, sounds, connecting flights, etc.
- Provide your child with books, food or other items which can help entertain him or her during the trip
- Let us know if it is your child's first flight so that, if time permits, we can give him or her a little extra attention

# Customers with disabilities

American Airlines and American Eagle endeavor to provide passengers with disabilities dignified, professional, and courteous service at all times. We have a team of employees who regularly consult with disability advisory groups on how we can improve airline accessibility and the quality of our service.

## Reservations special assistance coordinators

American Airlines and American Eagle Reservations Offices maintain a staff of Special Assistance Coordinators (SACs) whose function is to make pre-travel arrangements for our customers with disabilities. They have been specifically trained to work with customers who have self-identified as having a disability and are requesting special assistance.

The Reservations representative who responds to the customer's initial call passes pertinent information to a SAC. They will then personally contact the customer to arrange their special needs and provide a toll-free number for follow up questions. This information is communicated to Airport and Flight Services personnel to ensure all American personnel are notified and prepared to fulfill the customer's request.

## Pre-reserved seats

American Airlines and American Eagle block a limited number of seats on each aircraft to accommodate customers who identify themselves as having a qualified disability. Adjacent seats are provided, under certain circumstances, for customers with disabilities who must travel with a companion for assistance.

## Carry-on assistive devices

Canes, crutches and walkers capable of being collapsed small enough to fit into approved overhead and under seat stowage areas do not count toward your carry-on baggage item limit. They must be small enough to be stowed in such a manner as not to protrude into any seating row floor space or main aisle. Items such as seat cushions, detachable control boxes, armrests or footrests may also be carried on board with you.

Electronic medical assistive devices such as CPAP machines, respirators, ventilators that use non-spillable batteries may be accepted in the cabin on an individual basis provided they meet certain safety testing standards.

## Wheelchairs

American Airlines and American Eagle accept motorized and non-motorized assistive devices for transport. When necessary, we will disassemble and reassemble wheelchairs or assistive devices for customers when they travel. American Airlines and American Eagle provide storage for one passenger's collapsible, manual wheelchair in the cabin of each aircraft. This service is available on a first-come, first-served basis and has priority over carryon baggage belonging to other customers who board at the same city, provided the customer follows the pre-boarding procedure. In-cabin stowage space for assistive devices cannot be pre-reserved, but American Airlines and American Eagle accept carryon wheelchairs, provided they collapse to fit in an overhead bin or under a seat.

Non-collapsible wheelchairs/scooters are accepted as checked baggage. These items can be checked at the main ticket counter or the departure gate. American Airlines and American Eagle offer a special wheelchair service that allows you to check your wheelchair at the departure gate and claim it at your arrival gate free of charge. Although you can arrange to claim your chair at the connecting city, we recommend that the chair be checked through to the final destination. The additional time required to claim and recheck your chair at the connecting city may compromise your ability to make your connection. American Airlines and American Eagle have wheelchairs and our

representatives provide wheelchair service at connecting airports. Please let us know you will need this assistance when making your reservation.

Assistive devices approved for cabin transport do not count toward the combined number of checked and carryon baggage a passenger is allowed free of charge, nor do they count toward the limit on carryon items you may bring on board.

## Boarding assistance

If you have special needs, upon request, pre-boarding assistance will be provided to you, allowing you the opportunity to be seated prior to general boarding. A special aisle chair is available to assist you if you are unable to walk, and all of our jet aircraft are equipped with specially designed seats that feature moveable aisle armrests to help make seating easier.

## Medical oxygen

Customers requiring inflight medical oxygen may use only FAA-approved portable oxygen concentrators (POCs) during all phases of the flight. A 48-hour advance notice is required to complete medical paperwork and to ensure that an adequate supply of fully-charged batteries is available to power the device. Please contact Reservations at 1-800-433-7300 to arrange for assistance.

FAA approved POC:

- AirSep LifeStyle - RTCA sticker required
- AirSep FreeStyle
- AirSep Free Style 5
- AirSep FOCUS
- (Caire) SeQual eQuinox/Oxywell - model 4000**
- Devilbiss iGO
- Inogen One

- Inogen G2
- Inogen One G3
- Inova Labs - Lifechoice - (model number XYC100)
- Inova Labs LifeChoice Activox
- Invacare XPO2 includes model numbers (XPO100 and XPO100B)
- Invacare SOLO2
- Oxlife Independence or O2 Concepts Oxlife Independence

- Oxus, Inc. RS-00400 POC
- Precision Medical EasyPulse
- Respironics Inc's EverGO
- Respironics SimplyGo
- SeQual Eclipse models 1, 2 and 3*
- SeQual Eclipse 3 or 5 - 1000B*
- SeQual SAROS*
- Vbox Trooper

*SeQual Eclipse (models 1000, 1000A, and 1000B), and SeQual Eclipse SAROS may not be used on Republic Airways. These models are too large to fit under the seat for use on board the aircraft. These models may be transported in the cabin as assistive devices and stowed in the overhead compartments, but these models cannot be used on board the aircraft.

**Approved for use on American mainline aircraft; however, only approved on a case-by-case basis on Envoy aircraft.

## Complaint resolution officials for customers with special needs

We have employees at airports who are trained as Complaint Resolution Officials (CROs) and are available during operating hours. A Corporate Complaint Resolution Official is also available to assist CROs 24 hours per day, seven days per week.

**EXHIBIT G**

# Contradictory Communications from American Airlines

A. September 3, 2024 Email – Confirms permanent ban and appeal denial, relying on internal investigation.

B. March 28, 2025 Letter – Reinstates Plaintiff's right to fly, without explanation or apology.

**From:** AmericanAirlinesCustomerRelations@aa.com
**Subject:** Your Response From American Airlines
**Date:** September 3, 2024 at 9:16 AM
**To:** johnnunez@ymail.com



 **American Airlines**

September 3, 2024

Hello Mr. Nunez:

The Department of Transportation Aviation, Consumer Protection Division forwarded your correspondence under DOT case number TU2024083427 TU2024083426, TU2024088559, TU2024083427 regarding your travel on June 3, 2022. On behalf of American Airlines, I appreciate this opportunity to reply to your concerns.

Your allegations surrounding your travel experience are most serious, and we have treated them accordingly. It is our policy to look whole picture, as we are sure you will agree that a thorough investigation is the only fair and reasonable way to address concerns regarding discrimination.

Our records indicate that due to the events which took place on June 3, 2022, you were placed on the permanent internal refuse list. was noted that the captain supported the recommendation to deny your travel on flight AA1124.Given the circumstances, we canno your request for removing your travel ban with American Airlines.

As it relates to your request for an appeal, in the initial letter to you, we invited you to respond to Z1058197.aa.refuse@aa.com wit version of events. This was reviewed by our legal department for permanent placement. If you would like to reply and provide compelling evidence to support your case , you may do so.

In the interest of safety, in accordance with Federal Aviation Administration (FAA) regulations and our Conditions of Carriage, we reserve the right to deny boarding to any customer who may be a threat to the comfort and/or safety of other customers andour team members.

You mentioned that you felt discriminated against, which is of profound concern to us. Please know that discrimination goes agains everything we stand for, and we take allegations like yours very seriously; every interaction with us should be positive and helpful, exceptions. Which is why we provide our team members with training focused on ensuring every customer feels valued and respect regardless of race, gender, religion, ethnicity, or any other attributes.

It is imperative that every American Airlines team member understands our role in upholding these principles in every interaction a decision we make. Your feedback will help remind our team members of the importance of providing courteous and thorough explanations when things don't go as expected.

Mr. Nunez, at this point, we consider the matter closed. However, please rest assured that your input is being actively used to guide improvements. Thank you for reaching out again to reiterate your perspective.

Sincerely,

Katy Daniels
Customer Relations
American Airlines

AA Ref#1-34522661468

The information in this email is confidential and is intended solely for the addressee(s); access to anyone else is unauthorized. If this message has been sent to you in error, do r review, disseminate, distribute or copy it. If you are not the intended recipient, please delete this email from your email system.

If your comments are related to American Airlines service to, from, or in the United Kingdom and we have reached an impasse in terms of resolving your complaint, please kn we are obligated by the Civil Aviation Authority (CAA) to inform you that you may contact a CAA-approved Alternative Dispute Resolution (ADR) provider competent to de: airline service complaints. American Airlines, however, does not participate with an ADR in resolving disputes.

**From:** AmericanAirlinesCustomerRelations@aa.com
**Subject:** Your Response From American Airlines
**Date:** March 28, 2025 at 5:55 pm
**To:** johnnunez@ymail.com



**American Airlines** ✈

March 28, 2025

Hello Mr. Nunez:

The Department of Transportation Aviation Consumer Protection Division has recently forwarded your correspondence, case numb
TU2025023049. On behalf of American Airlines, we appreciate this opportunity to respond to your concerns.

Thank you for taking the time to share your concerns regarding your experience aboard American Airlines Flight 1124 on June 3, 2
We sincerely regret the frustration and distress this incident caused you, and we appreciate the opportunity to address your complair
thoroughly.

After a comprehensive review of your case, including the findings from the U.S. Department of Transportation's proceedings (Dock
G13-23-021), we would like to provide you with a response.

The DOT's investigation confirmed that our crew followed established policies regarding lavatory access and beverage service for r
revenue passengers. While we understand your perspective as a valued Platinum Executive member, the crew's decisions were mad
accordance with these policies. The administrative law judge did note that the situation could have been handled with greater
professionalism by our team, and we take this feedback seriously.

Regarding the flight diversion, this action was taken based on the captain's assessment of the situation at that time. We acknowledge
significant inconvenience this caused you, though the DOT found this decision to be within operational protocols. We are pleased to
the investigation confirmed your sobriety through the breathalyzer test administered upon landing. After careful consideration of all
factors, including the DOT's findings and our internal policies, we are unable to provide monetary or other compensation in this ins

We understand this may not be the resolution you were hoping for, but we want to assure you that we have used this experience to
reinforce our crew training programs, particularly in the areas of customer service and de-escalation techniques. Your feedback has
shared with our leadership team to help prevent similar situations in the future.

We appreciate your AAdvantage® loyalty very much, Mr. Nunez, and look forward to welcoming you on board your next America
Airlines flight.

Sincerely,
Mark Li San
Customer Relations
American Airlines

AA Ref#1-35979191183

The information in this email is confidential and is intended solely for the addressee(s); access to anyone else is unauthorized. If this message has been sent to you in error, do r
review, disseminate, distribute or copy it. If you are not the intended recipient, please delete this email from your email system.

If your comments are related to American Airlines service to, from, or in the United Kingdom and we have reached an impasse in terms of resolving your complaint, please kn
we are obligated by the Civil Aviation Authority (CAA) to inform you that you may contact a CAA-approved Alternative Dispute Resolution (ADR) provider competent to de
airline service complaints. American Airlines, however, does not participate with an ADR in resolving disputes.

**EXHIBIT H**

# Paid Itinerary and Confirmation – Flight AA2280 (April 7, 2025)

Proof of Plaintiff's reservation, payment ($152.48), and confirmed seat assignment. Despite reinstatement, Plaintiff was denied boarding and suffered financial and reputational harm.

**From:** **American Airlines** no-reply@info.email.aa.com
**Subject:** Your trip confirmation (MIA - MCO)
**Date:** April 6, 2025 at 10:43 pm
**To:** JOHNNUNEZ@ymail.com JOHNNUNEZ@YMAIL.COM

AA

American

Issued: April 7, 2025

# Your trip confirmation and receipt

You can check in via the American app 24 hours before your flight and get your mobile boarding pass.

Confirmation code: **ECHYQR**

**Monday, April 7, 2025**

**MIA**
Miami
**3:30 PM**

**AA 2280**

**MCO**
Orlando
**4:35 PM**

Seat:
Class: **Economy (B)**
Meals:

**Manage your trip**

Limited Time: Earn up to 75,000 bonus miles*
Find the Citi® / AAdvantage® card that's right for you. Terms Apply.
Learn more

## Your purchase



**From:** **American Airlines** no-reply@info.email.aa.com
**Subject:** Your Trip Credit
**Date:** April 7, 2025 at 12:51 pm
**To:** JOHNNUNEZ@ymail.com JOHNNUNEZ@YMAIL.COM

AA

American

# Your Trip Credit

Confirmation code: **ECHYQR**

We're pleased to provide you a Trip Credit for payment on future travel.

- You can redeem Trip Credit on aa.com or by calling Reservations.
- Keep this email until your Trip Credit has been used. For your security, Reservations cannot retrieve your Trip Credit number.
- If you're an AAdvantage® member, you can also view Trip Credit in your account.

Learn more about Trip Credit →

## Trip Credit

| | |
|---|---|
| Trip Credit number: | **0014457890161** |
| Issued to: | **John Nunez** |
| Amount: | **$53.48** |
| Expires on: | **Apr 7, 2026** |

**Terms and conditions:**

- Trip Credit is redeemable toward the purchase of air travel on flights

## Your purchase

**John Nunez - AAdvantage® #: 8N2\*\*\*\***

| | |
|---|---|
| New ticket (0012229712511) | $152.48 |
| [$127.61 + Taxes & carrier-imposed fees $24.87] | |

| | |
|---|---|
| **Total cost** | **$152.48** |

## Your payment

| | |
|---|---|
| AmericanExpress (ending 2019 ) | $152.48 |

| | |
|---|---|
| **Total paid** | **$152.48** |

## Bag information

| Checked Bag (Airport) | | Checked Bag (Online\*) | |
|---|---|---|---|
| 1st bag | $40.00 | 1st bag | $35.00 |
| 2nd bag | $45.00 | 2nd bag | $45.00 |

Maximum dimensions: 62 inches or 158 centimeters calculated as (length + width + height)
Maximum weight: 50 pounds or 23 kilograms
Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

\*Online payment available beginning 24 hours (and up to 4 hours) before departure.

Carry-on bags (American Airlines)

| **Personal item** | A small purse, briefcase, laptop bag, or similar item that must fit under the seat in front of you. |
|---|---|

# EXHIBIT J

## Email from American Airlines Counsel (April 8, 2025)

Email from attorney Kelly Kolb referencing Plaintiff's social media activity. Sent after Defendant had allegedly "closed the matter," the message demonstrates continued monitoring, potential retaliation, and emotional manipulation. This supports Plaintiff's claims of ongoing harm, viewpoint-based targeting, and intentional infliction of emotional distress.

**From:** **Kelly Kolb** Kelly.Kolb@bipc.com
**Subject:** American Airlines
**Date:** April 8, 2025 at 8:52 am
**To:** johnnunez@ymail.com
**Cc:** Dawn Nunziato dawn.nunziato@bipc.com



Mr. Nunez –

In your recent social media posts, you reference a March 28, 2025 letter from American Airlines to the Dept. of Transportation discussing your flight status. Can you send that letter to me please?

Kelly

**Mr. Kelly Kolb**
**Shareholder**

401 East Las Olas Boulevard
Suite 2250
Fort Lauderdale, FL  33301-4251
954 703 3944 (o)
kelly.kolb@bipc.com

# Buchanan

vCard | Bio | BIPC.com | Twitter | LinkedIn

CONFIDENTIAL/PRIVILEGED INFORMATION: This e-mail message (including any attachments) is a private communication sent by a law firm and may contain confidential, legally privileged or protected information meant solely for the intended recipient. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is prohibited and may be unlawful. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system.

**EXHIBIT I**

# Documentation of April 7, 2025 Denial and Business Consequence

Screenshot of check-in error, communication with AA agents, and statement from Plaintiff regarding loss of a client contract due to the travel disruption caused by AA's wrongful denial.

# American Airlines

PLAN TRAVEL      TRAVEL INFORMATION

Home      English ▼      AADVANTAGE®

Search AA.com

👤 John

## Your trip

« Show all trips

---

ⓘ **Save time at the airport with Express Bag Tags**

Check in online before your trip, add your checked bags, pay if needed, and get your mobile boarding passes.
Add bags »

When you get to the airport, scan your boarding pass at a kiosk to automatically print your bag tags. Attach the tags, leave your bags with an agent, and head to the gate.
Express Bag Tags▨

---

ⓘ **Please check in with an agent at the airport**

We're unable to check you in online.

---

Messages ③      ‹

**From:** **American Airlines** no-reply@info.email.aa.com
**Subject:** Trip Cancellation
**Date:** April 7, 2025 at 12:51 pm
**To:** JOHNNUNEZ@ymail.com JOHNNUNEZ@YMAIL.COM

AA

American

# Your trip is canceled

Confirmation code: **ECHYQR**

**JOHN NUNEZ**

Ticket number: 0012229712511

**Your trip was canceled on April 07, 2025 at 11:51 AM (CT).**

You canceled a Basic Economy fare ticket. If you're an eligible AAdvantage® member, you'll receive travel credit for your partial refund.

Learn about cancellations and changes →

Contact us

Privacy policy

**Download the American app**

App Store Google Play

© 2025 American Airlines, Inc. All Rights Reserved.

Please do not reply to this email address as it is not monitored. This email was sent to johnnunez@ymail.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this

